# STATE OF CONNECTICUT *v.* SHAWN WILKINS
## (15566)

Berdon, Norcott, Katz, Palmer and McDonald, Js.

Argued January 16—officially released April 22, 1997

*Glenn M. Conway*, certified legal intern, with whom were *Timothy H. Everett* and, on the brief, *Geoffrey Stone*, certified legal intern, for the appellant (defendant).

*Judith Rossi*, assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Roseanne Wagner*, assistant state's attorney, for the appellee (state).

*Opinion*

KATZ, J. The sole issue in this appeal is whether, under the circumstances of this case, the trial court properly denied the defendant's motion to suppress evidence found in his vehicle and on his person following a valid traffic stop. The defendant was charged by substitute information with one count of possession of a weapon in a motor vehicle in violation of General Statutes § 29-38,[1] and one count of possession of a con-

---

[1] General Statutes § 29-38 provides: "Weapons in vehicles. Any person who knowingly has, in any vehicle owned, operated or occupied by him, any weapon for which a proper permit has not been issued as provided in section 29-28 or section 53-206, or has not registered such weapon as required by section 53-202, as the case may be, shall be fined not more than one thousand dollars or imprisoned not more than five years or both, and the presence of any such weapon in any vehicle shall be prima facie evidence of a violation of this section by the owner, operator and each occupant thereof. The word 'weapon,' as used in this section, means any pistol or revolver, any dirk knife or switch knife or any knife having an automatic spring release device by which a blade is released from the handle, having a blade of over one and one-half inches in length, and any other dangerous or deadly weapon or instrument, including any slung shot, black jack, sand

trolled substance in violation of General Statutes § 21a-279 (c).[2] Following a two day hearing on the defendant's motion to suppress evidence, the trial court, *Koletsky, J.*, denied the motion and the defendant entered a written conditional plea of nolo contendere, reserving the right to appeal the denial of the motion to suppress, pursuant to General Statutes § 54-94a and Practice Book § 4003 (a).[3] Thereafter, the court, *Dyer, J.*, sentenced the defendant on both counts to a total effective

bag, metal or brass knuckles, stiletto, knife, the edged portion of the blade of which is four inches or over in length or martial arts weapon as defined in section 53a-3. The provisions of this section shall not apply to any person enrolled in and currently attending a martial arts school, with official verification of such enrolment and attendance, having any such martial arts weapon in a vehicle while traveling to and from such school."

[2] General Statutes § 21a-279 (c) provides: "Any person who possesses or has under his control any quantity of any controlled substance other than a narcotic substance, or a hallucinogenic substance other than marijuana or who possesses or has under his control less than four ounces of a cannabis-type substance, except as authorized in this chapter, for a first offense, may be fined not more than one thousand dollars or be imprisoned not more than one year, or be both fined and imprisoned; and for a subsequent offense, may be fined not more than three thousand dollars or be imprisoned not more than five years, or be both fined and imprisoned."

[3] General Statutes § 54-94a provides: "Conditional nolo contendere plea. Appeal of denial of motion to suppress or dismiss. When a defendant, prior to the commencement of trial, enters a plea of nolo contendere conditional on the right to take an appeal from the court's denial of the defendant's motion to suppress evidence based on an unreasonable search or seizure, motion to suppress statements and evidence based on the involuntariness of a statement or motion to dismiss, the defendant after the imposition of sentence may file an appeal within the time prescribed by law. The issue to be considered in such an appeal shall be limited to whether it was proper for the court to have denied the motion to suppress or the motion to dismiss. A plea of nolo contendere by a defendant under this section shall not constitute a waiver by the defendant of nonjurisdictional defects in the criminal prosecution."

Practice Book § 4003 (a) provides: "When a defendant, prior to the commencement of trial, enters a plea of nolo contendere conditional on the right to take an appeal from the court's denial of the defendant's motion to suppress evidence based on an unreasonable search or seizure, [motion to suppress statements and evidence based on the involuntariness of a statement] or motion to dismiss, the defendant after the imposition of sentence may file an appeal within the time prescribed by law. The issue to be

sentence of three years imprisonment, execution suspended after one year, and three years probation. This appeal followed.[4]

In this appeal, the defendant claims that the trial court improperly denied his motion to suppress evidence found on his person and in his vehicle in violation of the fourth amendment to the United States constitution[5] and article first, §§ 7 and 9, of the Connecticut constitution.[6] Because we conclude that the officers acted reasonably in detaining the defendant, conducting a patdown of his person and searching his vehicle, we affirm.

The following facts are undisputed.[7] On September 18, 1994, shortly after 4 a.m., Officer Paul Ciesinski of

considered in such appeal shall be limited to whether it was proper for the court to have denied the motion to suppress or the motion to dismiss. A plea of nolo contendere by a defendant under this [subsection] shall not constitute a waiver by the defendant of nonjurisdictional defects in the criminal prosecution. The court shall not accept a nolo contendere plea pursuant to this subsection where the denial of the motion to suppress would not have a significant impact upon the disposition of the case in the trial court. The court shall also decline to accept such a nolo contendere plea where the record available for review of the denial of the motion to suppress or motion to dismiss is inadequate for appellate review of the court's determination thereof."

[4] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).

[5] The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

[6] The constitution of Connecticut, article first, § 7, provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

The constitution of Connecticut, article first, § 9, provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

[7] In its oral decision denying the defendant's motion to suppress, the trial court stated facts regarding the incident that the defendant does not

the Hartford police department was on duty, driving northbound on Sigourney Street in Hartford, when he observed a red Nissan Maxima careen around a truck in the oncoming lane, cross the double yellow line and nearly hit his cruiser head-on. Ciesinski made a U-turn and followed the vehicle. Ciesinski did not call in for backup help because he was uncertain about whether he would be able to locate the vehicle. Furthermore, he believed no assistance was necessary because he was only contemplating a routine traffic stop. With Ciesinski in pursuit, the defendant drove into the parking lot behind an apartment building at 183 Sigourney Street. Ciesinski exited his cruiser and, after looking around for a few seconds, spotted the Maxima parked in the lot.

As Ciesinski approached the vehicle, he observed its two occupants "scrunching down" or "laying down" in the front seat of the car, as if trying to avoid detection. Concerned for his safety, Ciesinski drew his weapon as he approached from the rear of the vehicle. He then shouted to the occupants to sit up, and ordered them to raise their hands into his line of sight. Although both occupants sat up, the defendant disobeyed Ciesinski's repeated instructions to keep his hands in sight, twice dropping them down from the steering wheel out of the officer's line of vision.

Ciesinski believed the defendant may have been reaching down for a weapon. Aware that gunshots had been fired in the general area earlier in the evening, and concerned for his own safety, Ciesinski ordered the defendant to get out of the vehicle and into the rear seat of the cruiser, the door of which could not be opened from the inside. Ciesinski then ordered the passenger, subsequently identified as the defendant's

challenge on appeal as clearly erroneous and upon which this opinion relies. See *State* v. *Groomes*, 232 Conn. 455, 468, 656 A.2d 646 (1995).

brother, to get out of the Maxima and to stand against the trunk of the car, enabling the officer to call for backup without "running the risk of losing control of the situation." Up until this point, Ciesinski had believed it would not have been practical for him to call for backup on his portable radio. Within approximately five minutes of Ciesinski's call, Officer Michael Thomas arrived on the scene in his cruiser. After Ciesinski apprised Thomas of the situation, the officers removed the defendant from Ciesinski's cruiser and frisked both the defendant and the passenger for weapons. The defendant was then returned to Ciesinski's cruiser, and the passenger was placed in the rear of Thomas' cruiser.[8] Ciesinski then opened the front passenger door of the defendant's vehicle and observed "in plain view" on the floor of the car, toward the driver's side, a handgun, which was later identified as a .32 caliber revolver containing five live rounds and two spent rounds of ammunition. Ciesinski arrested the defendant for having a weapon in a motor vehicle and, incident to the arrest, he and Thomas then searched both the defendant and the vehicle. In the defendant's pocket, they found a small bag of marijuana.

The defendant claims that the search of his person and his vehicle violated his rights under the federal and state constitutions. Specifically, he contends that his removal from the vehicle at gunpoint, his detention in a locked police cruiser, the patdown of his person, and the subsequent search of the vehicle were constitutionally unreasonable.[9] We disagree.

[8] Although the defendant suggests that he was handcuffed after the initial patdown of his person and prior to being placed in the cruiser the second time, the trial court did not make such a finding. The trial court found only that the defendant had been handcuffed at some point during the incident. Indeed, our review of the record shows that the trial court expressly rejected the passenger's testimony that Ciesinski, acting alone, had handcuffed the defendant when he was first removed from his vehicle and before he was placed in the cruiser the first time.

[9] The defendant does not challenge the validity of the trial court's conclusion that there was probable cause for the police to make the traffic stop

I

The federal law of search and seizure in this area is well settled. "The fourth amendment to the federal constitution, made applicable to the states through the due process clause of the fourteenth amendment, provides in relevant part that [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . . *State* v. *Floyd*, 217 Conn. 73, 79–80, 584 A.2d 1157 (1991). Certain seizures are reasonable under the fourth amendment even in the absence of probable cause if there is a reasonable and articulable suspicion that a person has committed or is about to commit a crime. *Florida* v. *Royer*, 460 U.S. 491, 498, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983); *Terry* v. *Ohio*, [392 U.S. 1, 24, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)]; *State* v. *Lamme*, 216 Conn. 172, 184, 579 A.2d 484 (1990); *State* v. *Anderson*, 24 Conn. App. 438, 441, 589 A.2d 372, cert. denied, 219 Conn. 903, 593 A.2d 130 (1991)." (Internal quotation marks omitted.) *State* v. *Kyles*, 221 Conn. 643, 659–60, 607 A.2d 355 (1992).

When a reasonable and articulable suspicion exists, the detaining officer may conduct an investigative stop of the suspect in order to confirm or dispel his suspicions. *Terry* v. *Ohio*, supra, 392 U.S. 24; *State* v. *Federici*, 179 Conn. 46, 51, 425 A.2d 316 (1979); *State* v. *Acklin*, 171 Conn. 105, 112, 368 A.2d 212 (1976). During the course of a lawful investigatory detention, if the officer reasonably believes that the detained individual might be armed and dangerous, he or she may under-

for reckless driving. Furthermore, he acknowledges that, following a valid traffic stop, an officer may request the driver to step out of his or her vehicle. See *Pennsylvania* v. *Mimms*, 434 U.S. 106, 110–11, 98 S. Ct. 330, 54 L. Ed. 2d 331 (1977); *State* v. *Dukes*, 209 Conn. 98, 122, 547 A.2d 10 (1988). Indeed, the United States Supreme Court has recently held that this authority extends to passengers as well. *Maryland* v. *Wilson*,    U.S.   , 117 S. Ct. 882, 886, 137 L. Ed. 2d 41 (1997).

take a patdown search of the individual to discover weapons. *Terry* v. *Ohio*, supra, 24; *State* v. *Williams*, 157 Conn. 114, 118–19, 249 A.2d 245 (1968), cert. denied, 395 U.S. 927, 89 S. Ct. 1783, 23 L. Ed. 2d 244 (1969). Additionally, under the federal constitution, an officer conducting a *Terry* stop of an automobile may search the passenger compartment of the automobile for weapons, limited to areas where the weapon might be hidden, if he or she reasonably believes the suspect is potentially dangerous. *Michigan* v. *Long*, 463 U.S. 1032, 1049, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983).

"Reasonable and articulable suspicion is an objective standard that focuses not on the actual state of mind of the police officer, but on whether a reasonable person, having the information available to and known by the police, would have had that level of suspicion. . . . The police officer's decision . . . must be based on more than a hunch or speculation. . . . In justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." (Citations omitted; internal quotation marks omitted.) *State* v. *Gant*, 231 Conn. 43, 65, 646 A.2d 835 (1994), cert. denied, 514 U.S. 1038, 115 S. Ct. 1404, 131 L. Ed. 2d 291 (1995).

"The determination of whether a reasonable and articulable suspicion exists involves a two-part analysis: (1) whether the underlying factual findings of the trial court are clearly erroneous; and (2) whether the conclusion that those facts gave rise to such a suspicion is legally correct. See *State* v. *Cofield*, 220 Conn. 38, 44, 595 A.2d 1349 (1991). The trial court's conclusions must stand unless they are legally and logically inconsistent with the facts. . . . Id.; see *State* v. *Lasher*, 190 Conn. 259, 267, 460 A.2d 970 (1983)." (Internal quotation marks omitted.) *State* v. *Kyles*, supra, 221 Conn. 660–61. Because a trial court's determination of the validity of a

patdown search implicates a defendant's constitutional rights, however, we engage in a careful examination of the record to ensure that the court's decision was supported by substantial evidence. See *State* v. *Greenfield*, 228 Conn. 62, 68–69, 634 A.2d 879 (1993); *State* v. *Damon*, 214 Conn. 146, 154, 570 A.2d 700, cert. denied, 498 U.S. 819, 111 S. Ct. 65, 112 L. Ed. 2d 40 (1990); *State* v. *Northrop*, 213 Conn. 405, 414, 568 A.2d 439 (1990).

The defendant does not challenge as clearly erroneous the facts as set forth in the trial court's summary of the incident. Nor does he contest the legality of the initial stop, or Ciesinski's decision to order him out of the vehicle. See footnote 9. Rather, he argues that the circumstances and intensity of his detention exceeded the permissible bounds of a *Terry* stop. Specifically, he protests: (1) his detention in a police cruiser both before and after he was frisked for weapons and none were found on his person; (2) the search of his vehicle following that frisk, which resulted in the discovery of the gun; (3) his arrest for possession of a weapon in a motor vehicle; and (4) the search of his person incident to his arrest, which resulted in the discovery of marijuana.[10] We conclude that, under the circumstances of this case, the facts available to Ciesinski and Thomas at the time of the incident were sufficient under the federal constitution to justify the investigative stop and the subsequent frisk of the defendant as well as the limited weapons search of the passenger compartment of his vehicle.[11]

---

[10] The defendant argues that the police conduct leading up to and during the search of his vehicle was unconstitutional under the state and federal constitutions and that the seizure of the gun and the marijuana consequently were inadmissible fruits of the illegal intrusions. *Wong Sun* v. *United States*, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963); *State* v. *Greenfield*, supra, 228 Conn. 62

[11] Unlike the full warrantless searches of the vehicles at issue in *State* v. *Badgett*, 200 Conn. 412, 512 A.2d 160, cert. denied, 479 U.S. 940, 107 S. Ct. 423, 93 L. Ed. 2d 373 (1986), *State* v. *Dukes*, 209 Conn. 98, 547 A.2d 10 (1988), and *State* v. *Miller*, 227 Conn. 363, 630 A.2d 1315 (1993), none of which

It is undisputed that Ciesinski had observed the defendant drive recklessly, that reckless driving is a misdemeanor that carries a maximum possible penalty for a first offense of thirty days imprisonment and a fine of three hundred dollars; General Statutes § 14-222 (b);[12] and that, pursuant to General Statutes § 54-1f,[13] Ciesinski had the authority to arrest the defendant. Under Connecticut law, the decision of a police officer

involved immediate, legitimate safety concerns on the part of the officers involved, the search presently at issue, and the only basis upon which we decide this case, was a limited weapons search of the passenger compartment of the defendant's vehicle under the principles articulated in *Terry* v. *Ohio*, supra, 392 U.S. 24, and *Michigan* v. *Long*, supra, 463 U.S. 1049.

[12] Ciesinski issued the defendant a misdemeanor summons and the state charged him with reckless driving in violation of § 14-222. That charge was nolled after the defendant entered his conditional nolo plea.

[13] General Statutes § 54-1f provides: "Arrest without warrant. Pursuit outside precincts. (a) For purposes of this section, the respective precinct or jurisdiction of a deputy sheriff or a special deputy sheriff shall be wherever he is required to perform his duties. Peace officers, as defined in subdivision (9) of section 53a-3, in their respective precincts, shall arrest, without previous complaint and warrant, any person for any offense in their jurisdiction, when the person is taken or apprehended in the act or on the speedy information of others, provided that no constable elected pursuant to the provisions of section 9-200 shall be considered a peace officer for the purposes of this subsection, unless the town in which such constable holds office provides, by ordinance, that constables shall be considered peace officers for the purposes of this subsection.

"(b) Members of the division of state police within the department of public safety or of any local police department or any chief inspector or inspector in the division of criminal justice shall arrest, without previous complaint and warrant, any person who the officer has reasonable grounds to believe has committed or is committing a felony.

"(c) Members of any local police department or the office of state capitol security, sheriffs, deputy sheriffs, special deputy sheriffs and constables who are certified under the provisions of sections 7-294a to 7-294e, inclusive, and who perform criminal law enforcement duties, when in immediate pursuit of one who may be arrested under the provisions of this section, are authorized to pursue the offender outside of their respective precincts into any part of the state in order to effect the arrest. Such person may then be returned in the custody of such officer to the precinct in which the offense was committed.

"(d) Any person arrested pursuant to this section shall be presented with reasonable promptness before proper authority."

who has arrested a person for a motor vehicle offense either to release that person on his own recognizance or to take that person into custody is controlled by General Statutes § 14-140 (a), which provides in pertinent part: "Any person who has been arrested by an officer for a violation of any provision of any statute relating to motor vehicles may be released, upon his own recognizance, by such officer at his discretion . . . ." That section also provides certain exceptions for serious offenses that are not relevant here. The statute presumes custody and then permits the officer, in his discretion, to release the offender. *State* v. *Carolina*, 40 Conn. App. 762, 765–66, 673 A.2d 562, cert. denied, 237 Conn. 914, 675 A.2d 886 (1996). Consequently, Ciesinski had the authority to take the defendant into custody.[14] The issue is not whether Ciesinski intended to take the defendant to the precinct; *Scott* v. *United States*, 436 U.S. 128, 138, 98 S. Ct. 1717, 56 L. Ed. 2d 168 (1978) (officer's state of mind irrelevant provided that circumstances, viewed objectively, justify action); rather, the issue is whether, under an objective standard, there has been an unjustifiable intrusion into the constitutional zone of privacy. It is with this statutory authority to arrest in mind that we consider whether Ciesinski acted reasonably in detaining the defendant.

At 4 a.m., after witnessing the traffic offense, Ciesinski approached the defendant's vehicle, and observed two men[15] who appeared to be trying to evade detection

[14] The state relies upon this presumption of custody to argue that the searches of the defendant and his vehicle were incident to his arrest. See *State* v. *Waller*, 223 Conn. 283, 612 A.2d 1189 (1992). The trial court, however, did not rely upon this theory as a basis upon which to deny the defendant's motion to suppress evidence. In light of our decision in this case, we need not decide whether to endorse the state's reasoning.

[15] In its memorandum of decision, the trial court referred to Ciesinski, the defendant and his brother as "healthy, good-sized, normal male individuals." The defendant's brother testified that he weighed approximately 225 pounds.

by ducking down in their seats.[16] Ciesinski was working alone in a part of Hartford known by him to be a high crime area. Additionally, there had been an earlier broadcast over the police radio that gunshots had been fired in the vicinity. When told to keep their hands in sight, the car's passenger had complied with the directive but the defendant had twice dropped his hands out of sight, in direct disobedience of Ciesinski's order, prompting Ciesinski to order the defendant out of the vehicle. As he exited the vehicle, the defendant did not display a license, registration or anything else that might otherwise have dispelled the officer's suspicions regarding the defendant's hand movements.

Under those circumstances, Ciesinski, who was still alone, could reasonably have been concerned for his safety. The defendant's argument that the frisk was unjustified because nothing occurred after he was removed from the vehicle that "in any way caused Officer Ciesinski's 'suspicion' to rise" focuses on the wrong inquiry. The question is whether anything occurred after the defendant was removed from the vehicle that reasonably would have caused Ciesinski's suspicions to *abate*. Consequently, the officer could reasonably have felt the need to frisk the defendant to assure himself that no weapons were readily available to the two men. In order to accomplish this safely, he first had to secure the situation and call for backup. He was not required to ignore reasonable safety concerns to the point of his own peril. *State* v. *Escobales*, 16 Conn. App. 272, 275, 547 A.2d 553, cert. denied, 209 Conn. 827, 552 A.2d 434

---

[16] Although the defendant's brother lived in the building adjacent to the parking lot in which the incident occurred, the trial court expressly found that Ciesinski was unaware of that information until after the gun was discovered and, therefore, that fact can play no role in assessing whether the officer acted reasonably. Moreover, neither the defendant nor his brother had exited from the vehicle to walk toward the building prior to Ciesinski's arrival. Instead, they appeared to be attempting to hide to avoid detection.

(1988), cert. denied, 490 U.S. 1023, 109 S. Ct. 1753, 104 L. Ed. 2d 189 (1989).

One function of a constitutionally permissible *Terry* stop is to maintain the status quo for a brief period of time so as to enable the police to conduct their investigation. *State* v. *Braxton*, 196 Conn. 685, 689, 495 A.2d 273 (1985). "Determination of the means that are reasonably necessary to maintain the status quo necessarily depends upon a fact-bound examination of the particular circumstances of the particular governmental intrusion on the personal security of a suspect." Id. "[T]he scope of intrusion permitted will vary to some extent with the particular facts and circumstances in each case." *Florida* v. *Royer*, supra, 460 U.S. 500.

Under the circumstances of this case, and in light of police procedure that prohibited Ciesinski from approaching or handcuffing either occupant without backup, it was reasonably necessary to separate the defendant and his brother by placing one in the cruiser and ordering the other to stand against the vehicle. See *State* v. *Braxton*, supra, 196 Conn. 690 ("[w]ithout immediate access to the assistance of fellow officers, a lone police officer may reasonably need the facilities of his police cruiser for a brief period of time so that he may safely continue to assist in the investigation of the crime"). The first detainment of the defendant in the cruiser lasted only until Thomas arrived, at which time the officers were able to conduct a patdown of both the defendant and the passenger for weapons. In choosing among his available options, an officer may reasonably determine that it is safer, and thus more prudent, to secure the situation by placing a suspect, whose conduct gave rise to the lawful investigatory detention, in the cruiser for a brief period of time rather than to risk his personal safety by conducting a limited protective search of the front seat of a vehicle with the suspect and his passenger standing over him. We do

not require police officers who are properly attempting to neutralize the threat of physical harm to do so at increased peril. *State* v. *Escobales*, supra, 16 Conn. App. 275. Requiring an officer to conduct the limited search allowed under *Michigan* v. *Long*, supra, 463 U.S. 1049, in such a fashion would be incompatible with the fundamental precepts underlying *Terry*.

Moreover, although nothing was discovered here during the patdown of the defendant or his passenger, Ciesinski still had not had the opportunity to search the vehicle to dispel his initial reasonable concerns of a safety threat. At that point in time, Ciesinski had two choices—either issue a summons and release the defendant or arrest him for the misdemeanor offense. If he merely intended to issue a summons and release the defendant, Ciesinski would have been reasonably justified in making sure there was no weapon available to the defendant immediately upon his release.[17] *Michigan* v. *Long*, supra, 463 U.S. 1051–52 ("[T]he officers did not act unreasonably in taking preventive measures to ensure that there were no other weapons within [the defendant's] immediate grasp before permitting him to reenter his automobile. . . . [I]f the suspect is not placed under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside."); see *United States* v. *Sanders*, 994 F.2d 200 (5th Cir. 1993) (if no probable cause for arrest, officer would have released defendant who would then have had ability to reach gun). We conclude that the officers here were justified in checking the vehicle before releasing the two men, either of whom would have had access to the vehicle and any weapon therein.

[17] The other alternative would have been for the officers to formally arrest the defendant. A formal arrest, however, constitutes a far greater intrusion into the defendant's privacy than the brief detention needed in this case to confirm the officers' safety and, therefore, would not have been a reasonable alternative.

We tolerate the *Terry* patdown to protect the police in the performance of their investigatory duties from serious injury as a result of concealed weapons. Under the circumstances of this case, this goal would have been only half accomplished had the officers not been able to check the front seat.[18] "[T]here can be no ready test for determining reasonableness other than by balancing the need to search against the invasion which the search entails." *Camara* v. *Municipal Court*, 387 U.S. 523, 536–37, 87 S. Ct. 1727, 18 L. Ed. 2d 930 (1967). "We judge the permissibility of a particular law enforcement practice by balancing its intrusion on the individual's interests against its promotion of legitimate state governmental interests, and examine the intrusion to determine whether it is the minimum search necessary under the circumstances. *State* v. *Lamme*, 19 Conn. App. 594, 599, 563 A.2d 1372 (1989), aff'd, 216 Conn. 172, 579 A.2d 484 (1990)." *State* v. *Boisvert*, 40 Conn. App. 420, 425, 671 A.2d 834, cert. denied, 237 Conn. 903, 674 A.2d 1332 (1996).

On the basis of our review of the record, we conclude that, in light of the facts found by the trial court, the search of the vehicle was constitutionally valid. Ciesinski acted upon his reasonable suspicion, sufficiently articulated in his testimony as credited by the trial court and objectively supported by the circumstances surrounding the encounter, that the defendant might have been armed. Furthermore, the protective search of the recently occupied front seat of the vehicle was properly restricted to the area where the defendant might have dropped something from his hands when he lowered them out of the officer's sight. The search did not exceed

---

[18] Moreover, police officers routinely are required to request the driver to produce the vehicle's registration certificate in conducting a traffic offense investigation. It would not have been prudent, however, for Ciesinski to ask for this paper, usually kept in the vehicle, until he was certain there was no weapon in the vehicle.

constitutionally permissible bounds under the federal constitution.

## II

We next turn to an analysis of the constitutional validity of the search of the defendant's person and his vehicle under the state constitution. Specifically, the defendant claims that the officers violated his rights under article first, §§ 7 and 9, of the Connecticut constitution when they removed him from his vehicle at gunpoint, when they placed him in the cruiser both before and after he was frisked for weapons, and when they searched his vehicle. We disagree.

It is well settled that we are not bound by the decisions of the United States Supreme Court in interpreting the contours of article first, §§ 7 and 9. *State* v. *Lamme*, supra, 216 Conn. 183. "It is well established that federal constitutional . . . law establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection for such rights. . . . *State* v. *Oquendo*, 223 Conn. 635, 649, 613 A.2d 1300 (1992). Moreover, we have held that [i]n the area of fundamental civil liberties—which includes all protections of the declaration of rights contained in article first of the Connecticut constitution—we sit as a court of last resort. . . . In such constitutional adjudication, our first referent is Connecticut law and the full panoply of rights Connecticut citizens have come to expect as their due. Accordingly, decisions of the United States Supreme Court defining fundamental rights are persuasive authority to be afforded respectful consideration, but they are to be followed by Connecticut courts only when they provide no less individual protection than is guaranteed by Connecticut law. . . . *State* v. *Marsala*, 216 Conn. 150, 160, 579 A.2d 58 (1990). Recognizing that our state constitution is an instrument of progress

. . . is intended to stand for a great length of time and should not be interpreted too narrowly or too literally . . . *State* v. *Oquendo*, supra, 649; we have concluded in several cases that the state constitution provides broader protection of individual rights than does the federal constitution. See, e.g., id., 652; *State* v. *Marsala*, supra, 171; *State* v. *Dukes*, 209 Conn. 98, 112, 547 A.2d 10 (1988), and cases cited therein." (Internal quotation marks omitted.) *State* v. *DeFusco*, 224 Conn. 627, 632, 620 A.2d 746 (1993).

Specifically, we have held that article first, § 7, affords protections to the citizens of this state beyond those provided by the fourth amendment to the federal constitution, as that provision has been interpreted by the United States Supreme Court. See *State* v. *Miller*, 227 Conn. 363, 379, 630 A.2d 1315 (1993); *State* v. *Geisler*, 222 Conn. 672, 690, 610 A.2d 1225 (1992); *State* v. *Marsala*, supra, 216 Conn. 160–61; *State* v. *Dukes*, supra, 209 Conn. 120, 122–23. We have also held that article first, § 9, provides protections beyond those afforded by the fourth amendment. See *State* v. *White*, 229 Conn. 125, 149, 640 A.2d 572 (1994).

In our independent determination of whether to uphold the propriety of a search as a matter of state constitutional law, several factors may be useful: "(1) the *textual approach*; see, e.g., *Stolberg* v. *Caldwell*, 175 Conn. 586, 597–98, 402 A.2d 763 (1978), appeal dismissed sub nom. *Stolberg* v. *Davidson*, 454 U.S. 958, 102 S. Ct. 496, 70 L. Ed. 2d 374 (1981) ('Unless there is some clear reason for not doing so, effect must be given to every part of and each word in the constitution.'); (2) *holdings and dicta of this court, and the Appellate Court*; see, e.g., *Doe* v. *Maher*, 40 Conn. Sup. 394, 448–49, 515 A.2d 134 (1986) (trial court used strict scrutiny to analyze sex discrimination claim based on the equal protection clause of the state constitution, relying, in part, on dicta from the Connecticut Supreme Court

regarding what standard would be used once Connecticut's equal rights amendment was adopted); (3) *federal precedent*; see, e.g., *State* v. *Lamme*, [supra, 216 Conn. 184] ('The adoption of federal constitutional precedents that appropriately illuminate open textured provisions in our own organic document in no way compromises our obligation independently to construe the provisions of our state constitution.'); (4) *sister state decisions* or sibling approach; see, e.g., *State* v. *Gethers*, 197 Conn. 369, 386–87, 497 A.2d 408 (1985); *Cologne* v. *Westfarms Associates*, [192 Conn. 48, 58–59, 469 A.2d 1201 (1984)]; (5) the *historical approach*, including the historical constitutional setting and the debates of the framers; see, e.g., *State* v. *Lamme*, supra, [216 Conn.] 178–80; *Cologne* v. *Westfarms Associates*, supra, 60–62; *Palka* v. *Walker*, 124 Conn. 121, 126, 198 A. 265 (1938); and (6) *economic/sociological considerations*. See *State* v. *Barton*, [219 Conn. 529, 546, 594 A.2d 917 (1991)]; *State* v. *Dukes*, supra, [209 Conn.] 115; see generally *State* v. *Jewett*, 146 Vt. 221, 500 A.2d 233 (1985); M. Margulies, 'Connecticut's Free Speech Clauses: A Framework and an Agenda,' 65 Conn. B.J. 437 (1991) (an analytical framework for state constitutional analysis in the context of the free speech clauses); E. Peters, 'State Constitutional Law: Federalism in the Common Law Tradition,' 84 Mich. L. Rev. 583 (1986) (book review)." (Emphasis in original.) *State* v. *Geisler*, supra, 222 Conn. 685–86.

Of these analytical tools, in his challenge to his detention, the defendant "relies primarily on the developed body of search and seizure case law based on the state constitution which [has] delineated the boundary between the warrantless police intrusions that are nonetheless constitutional and those warrantless intrusions that violate article [first], § 7, of the state constitution."[19]

---

[19] The defendant does not make an independent argument under article first, § 9, of the state constitution. See *State* v. *White*, supra, 229 Conn. 149.

Specifically, he claims that when he was placed in the cruiser, he was "seized" in violation of the *Oquendo* requirement that the *Terry* seizure be justified with particularized information and that, even if this early intrusion had been proper, his placement in the cruiser after the frisk, in the absence of articulable and specific facts, was unreasonable.

The defendant's reliance on *Oquendo* does little to advance his cause. In that case, this court declined to adopt the restricted definition of a seizure employed by the United States Supreme Court in *California* v. *Hodari D.*, 499 U.S. 621, 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991), and concluded that the defendant had been seized within the meaning of article first, §§ 7 and 9, of the Connecticut constitution. *State* v. *Oquendo*, supra, 223 Conn. 652–53. That having been determined, the court proceeded to decide whether the trial court had properly concluded that the seizure had been grounded on a reasonable and articulable basis of suspicion. "Article first, §§ 7 and 9, of our state constitution permit a police officer in appropriate circumstances and in an appropriate manner to detain an individual for investigative purposes even though there is no probable cause to make an arrest . . . . In determining whether the detention was justified in a given case, a court must consider if [b]ased upon the whole picture the detaining officers [had] a particularized and objective basis for suspecting the particular person stopped of criminal activity. . . . A court reviewing the legality of a stop must therefore examine the specific information available to the police officer at the time of the initial intrusion and any rational inferences to be derived therefrom. . . . These standards, which mirror those set forth by the United States Supreme Court in *Terry* v. *Ohio*, supra, [392 U.S. 27] with regard to fourth amendment analysis, govern the legality of investigatory detentions under article first, §§ 7 and 9, of our

state constitution. . . ." (Citations omitted; internal quotation marks omitted.) Id., 654.

The state does not argue, as it did in *Oquendo*, that the defendant had not been seized. Rather, the state defends the intrusion in this case as reasonable under the standards set forth in *Terry* v. *Ohio*, supra, 392 U.S. 27. We have already stated that we agree with the state that the police conduct regarding the defendant's person was in all respects appropriate. Accordingly, we conclude that the trial court properly determined that the detaining officers acted diligently to pursue a means of investigation that was likely to confirm or dispel their suspicions quickly.

The defendant also argues, however, that the state constitution does not permit the protective search of a vehicle for weapons, although the right to make such a search was upheld under the federal constitution in *Michigan* v. *Long*, supra, 463 U.S 1047–50. He relies upon four of the six factors noted in *State* v. *Geisler*, supra, 222 Conn. 685:[20] (1) Connecticut case law on search and seizure; (2) Justice Brennan's dissenting opinion in *Michigan* v. *Long*, supra, 1053; (3) the sister state decision in *People* v. *Torres*, 74 N.Y.2d 224, 543 N.E.2d 61, 544 N.Y.S.2d 796 (1989); and (4) the economic, social and doctrinal legal values discussed by Professor Wayne LaFave in his treatise on search and seizure.[21] We are unpersuaded.

Although our state constitution does in some instances afford greater protection than its federal counterpart, no state court precedents discussing *Terry* searches support the defendant's argument for independent meaning. Applications of *Terry* principles in the

---

[20] The defendant provides no textual or historical basis for assigning independent meaning to our state constitutional provisions relating to limited vehicle searches for weapons.

[21] See 4 W. LaFave, Search and Seizure (3d Ed. 1996) § 9.4–9.5 (e).

context of motor vehicle stops are already embodied in our state constitution. See, e.g., *State* v. *Torres*, 230 Conn. 372, 382–83, 645 A.2d 529 (1994) (reasonable articulable suspicion standard); *State* v. *Lamme*, supra, 216 Conn. 172 (principles of *Terry* define when detention is clearly warranted by law under article first, § 9, of state constitution); *State* v. *Dukes*, supra, 209 Conn. 122 (state constitution permits police to require occupants to step out of lawfully stopped motor vehicle); *State* v. *Anderson*, supra, 24 Conn. App. 441 (state and federal constitutions permit brief investigatory stops based on reasonable and articulable suspicion).

Against this background, we must decide whether the safety concerns underlying *Terry* should be abandoned when those very same safety concerns prompt a limited weapons search of the passenger compartment of a lawfully stopped vehicle. We reject the defendant's argument that an area search is per se inconsistent with a *Terry* patdown of the person. We have stated that "[a]uthorizing police under our constitution to go beyond a patdown . . . for weapons means that the intensity of such a search is limited to that which, under the circumstances, is necessary to the discovery of weapons. Thus, it will depend upon what is reasonable to the officer at that time and permits the accomplishment of the purpose of neutralizing potentially available weapons without endorsing a broader purpose of searching for evidence." *State* v. *Dukes*, supra, 209 Conn. 122–23. The defendant has proffered no principled reason why a different approach should apply in this case.

On the basis of the totality of the circumstances standard by which we assess the propriety of a limited protective search of a motor vehicle for weapons; *State* v. *Kyles*, supra, 224 Conn. 661; we conclude that the principles of *Terry* were properly vindicated when Ciesinski took preventive measures to ensure that there

would be no weapons within the defendant's immediate grasp before permitting him to reenter his vehicle. "[T]he intrusion was 'strictly circumscribed by the exigencies which justif[ied] its initiation.'" *Michigan* v. *Long*, supra, 463 U.S. 1051, quoting *Terry* v. *Ohio*, supra, 392 U.S. 26.

To accept the defendant's approach would impose upon a police officer a Hobson's choice: do not make a limited intrusion even though there exists a reasonable belief that a weapon may be concealed, thereby increasing the risk that the officer will be shot; or, when possible, as in this case, formally arrest the defendant and have the vehicle towed to the station to ensure police safety. Neither of these alternatives, however, is reasonable.

Finally, the defendant relies on *People* v. *Torres*, supra, 74 N.Y.2d 224, in which the New York Court of Appeals declined to adopt *Michigan* v. *Long*, supra, 463 U.S. 1032.[22] A close look at *Torres*, however, persuades us that its reasoning is flawed. In *Torres*, the court began by emphasizing that its decision to reject federal precedent was "foreshadowed" by its decision in *New York* v. *Belton*, 55 N.Y.2d 49, 432 N.E.2d 745, 447 N.Y.S.2d 873 (1982), wherein that court on remand declined to follow the United States Supreme Court decision in *New York* v. *Belton*, 453 U.S. 454, 460–61, 101 S. Ct. 2860, 69 L. Ed. 2d 768 (1981) (automobile's passenger compartment and closed containers within that compartment may be searched as incident to lawful arrest). Against that background, and blurring the distinction between the type of search approved by the United States Supreme Court in *Belton*, and the one approved in *Michigan* v. *Long*, supra, 1049, the New

---

[22] We note that the defendant cites to no other case, and we have found none, in which a state court determines that its state constitution prohibits the protective search of a vehicle for weapons upheld in *Michigan* v. *Long*, supra, 463 U.S. 1032.

York Court of Appeals held in *Torres* that it was an unjustifiable intrusion for police officers, following a lawful *Terry* stop based upon an anonymous tip regarding an individual wanted on homicide charges, to reach into the defendant's vehicle, after the two occupants had been removed and while one, the defendant, was still being frisked, and remove and search a shoulder bag taken from the front seat, where it had been left by the defendant. The court found the concern in *Long* regarding the possibility that the defendant, upon reentry into his vehicle, might reach for a concealed weapon to be "unrealistic" and "far-fetched." *People* v. *Torres*, supra, 230. We disagree and have already concluded otherwise.

The dissent in *Torres* better recognizes that "officers' . . . safety concerns are not [always] alleviated, in law and certainly not in fact, by a frisk of the person only [where there exists] the continuing, frighteningly real nature of the threat presented by the accessibility of the gun as soon as the defendant might reenter or reach into the car." Id., 236 (Bellacosa, J., dissenting). This is particularly true under the circumstances of this case, wherein the defendant repeatedly lowered his hands despite the officer's request to keep them in sight. Accordingly, we conclude that the trial court applied the correct standards and properly concluded that Ciesinski was reasonably justified in his behavior toward the defendant and his vehicle.

The judgment is affirmed.

In this opinion NORCOTT, PALMER and MCDONALD, Js., concurred.

BERDON, J., dissenting. Although I believe that the conduct of the police in this case clearly violated the federal constitutional rights of the defendant, Shawn Wilkins, I focus first on an equally disturbing aspect of the majority opinion. The majority, for the first time,

sanctions a *Terry*[1] search of an automobile under our state constitution, the preclusion of which I thought was put to rest almost ten years ago in *State* v. *Dukes*, 209 Conn. 98, 547 A.2d 10 (1988), and under our subsequent state constitutional jurisprudence with respect to automobile searches.[2]

# I

Before analyzing the constitutional issues in this case, I shall briefly set forth the undisputed facts unembellished by advocacy. The defendant drove his automobile across a double yellow line in the road and nearly collided with the oncoming police cruiser operated by Officer Paul Ciesinski. Ciesinski turned his cruiser around and followed the vehicle because he intended to issue a traffic summons, although he never turned on his cruiser's lights or siren. Ciesinski drove into the parking lot behind an apartment building, where he observed the automobile that he was pursuing parked in the lot. He became suspicious of the defendant and his passenger when he saw the "two men in the car scrunching down or laying down on the seat which made [him] think they didn't want [him] to see them." Ciesinski drew his gun and shouted to the occupants to sit up and raise their hands in his line of sight.[3]

Ciesinski became concerned for his safety and justified that concern on the following grounds: It was a

---

[1] *Terry* v. *Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

[2] Although in *State* v. *Kyles*, 221 Conn. 643, 607 A.2d 355 (1992), we visited *Michigan* v. *Long*, 463 U.S. 1032, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983), which authorizes a *Terry* search of an automobile under the federal constitution, I pointed out in my dissenting and concurring opinion in *Kyles* that the defendant failed to "raise issues of privacy under our state constitution [namely, the state constitutional provisions which protect the residents of this state against unreasonable searches and seizures under article first, § 7, and the protections afforded by article first, § 9] either at trial or in this court." *State* v. *Kyles*, supra, 672.

[3] Ciesinski was an inexperienced police officer, having been sworn in as an officer approximately five weeks prior to the event in question and having worked a shift alone for only approximately two weeks.

"high crime area," there was a report of gunshots having been fired in the area previously that night, and the defendant, in response to Ciesinski's order, "put his hands on the steering wheel, left them there for a matter of seconds and then dropped them into his lap, where-upon [Ciesinski] ordered him to put his hands on the steering wheel, which he did for a couple of seconds and then dropped them down again."

Ciesinski then ordered the defendant, at gunpoint, to exit the vehicle and to enter the rear seat of his cruiser, where, due to the fact that the rear doors could not be opened from the inside, he was incarcerated. Ciesinski never asked the defendant for a driver's license, the vehicle's registration,[4] or for any other identification. Ciesinski also ordered the vehicle's passenger, at gun-point, to exit the vehicle and to stand against the rear of the car. Once again, he never asked for any form of identification. Ciesinski called for backup, and Officer Michael Thomas arrived at the scene in his cruiser a few minutes later. The defendant was then removed from Ciesinski's cruiser, and the officers frisked both the defendant and the passenger for weapons, finding none. After the search for weapons, the officers failed again to ask either of the men for identification. The defendant was then handcuffed[5] and for a *second time*

---

[4] The majority incredibly turns this around by stating that "[a]s he exited the vehicle, the defendant did not display a license, registration or anything else that might otherwise have dispelled the officer's suspicions regarding the defendant's hand movements." Does the majority expect that the defendant or any other human being who has been ordered by a police officer to exit an automobile at gunpoint would say something like, "Look officer, I have a license and registration?" The fact is that Ciesinski never asked for the defendant's license, registration or any other identification.

[5] The majority questions at what point in time the defendant was hand-cuffed. Although there was no specific finding made by the trial court, the record supports the fact that the defendant was handcuffed before or at the time he was locked in the police cruiser for a second time. The trial court elicited testimony from Thomas that the defendant and his passenger "were handcuffed prior to the opening of the door" of the defendant's vehicle. It is uncontroverted that the defendant and his passenger were

locked in the rear of Ciesinski's cruiser and the passenger was locked in the rear of Thomas' cruiser. Ciesinski then proceeded to open the front passenger door of the defendant's vehicle, where he observed a handgun on the floor of the car. Ciesinski at that time arrested the defendant, and the officers fully searched the defendant and the vehicle, as a search incident to an arrest. Subsequently, it was learned that the passenger lived in the apartment building whose parking lot they were in, and that the passenger was the brother of the defendant.

Ciesinski's original police incident report made no mention that the defendant or his passenger were "scrunching down" in the front seat as he approached the defendant's vehicle or that the defendant failed to keep his hands on the steering wheel. Only after talking with other officers did Ciesinski add information to his report, in a supplemental page, describing the furtive movements and the defendant's failure to keep his hands placed on the steering wheel. I can only conclude, as a result of this afterthought, that either Ciesinski considered that these claims contained in the addendum to his report were insignificant, or their subsequent inclusion is highly suspect. If the former is the case, it is obvious that they played no part in Ciesinski's motivation and he therefore did not have a reasonable and articulable suspicion that there was criminal activity. Of course, if these claims are not true, the motion to suppress should have been granted. We should not be blind as judges for what we know as men and women.

locked in the police cruisers prior to and at the time the door of the defendant's vehicle was opened for a *Terry* search. It does not take much logic to conclude that prior to, or at the time he was locked in the police cruiser for a second time, the defendant was handcuffed. Instead, the majority seems vaguely to conclude otherwise because the "trial court expressly rejected the passenger's testimony that Ciesinski, acting alone, had handcuffed the defendant when he was first removed from his vehicle and before he was placed in the cruiser the first time," that being contrary to police regulations. As acknowledged by the majority, police regulations in Hartford require that a backup officer be present before a suspect is handcuffed.

## II

In *Michigan* v. *Long*, 463 U.S. 1032, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983), a majority of the United States Supreme Court found that, under the federal constitution, a *Terry* search of an automobile—that is, a "search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." Id., 1049.

In the present case, it is undisputed that the search of the defendant's automobile was a *Terry* search and not a search incident to an arrest. Although Ciesinski had probable cause to arrest the defendant for the traffic violation, which in this case technically constituted a misdemeanor,[6] it was never his intention to do so. Ciesinski merely wanted to issue a traffic summons to the operator of the automobile. Accordingly, this case must be viewed as a stop for a mere traffic violation. The defendant in this case clearly raised the state constitutional protections against unreasonable searches and seizures, under article first, §§ 7 and 9, of the Connecticut constitution.

Our strong preference for the right of privacy, to be free from unreasonable searches and seizures, and to insist that a search of one's belongings be supported by a warrant issued by a detached magistrate based upon probable cause, under the state constitution, has

---

[6] See General Statutes § 14-222 ("No person shall operate any motor vehicle upon any public highway . . . recklessly . . . . Any person who violates any provision of this section shall be fined not less than one hundred dollars nor more than three hundred dollars or imprisoned not more than thirty days . . . .").

clearly been demonstrated in other cases. This court has previously guarded our right to be protected from unwarranted intrusions by the state as a fundamental right of our democracy. In *State* v. *Oquendo*, 223 Conn. 635, 649–50, 613 A.2d 1300 (1992), we concluded that "article first, §§ 7 and 9, of the Connecticut constitution afford greater protection to the citizens of this state than does the federal constitution in the determination of what constitutes a seizure."

Accordingly, we have generally given a more expansive interpretation of our state constitution's dual protections against unreasonable searches and seizures.[7] See, e.g., *State* v. *Dukes*, supra, 209 Conn. 120 ("to the extent that [*United States* v. *Robinson*, 414 U.S. 218, 94 S. Ct. 467, 38 L. Ed. 2d 427 (1973)] allows unlimited searches in contexts that extend beyond full custodial arrests, we disavow its holding concerning the level of protection to which individuals are entitled against unreasonable searches and seizures under article first, § 7, of the Connecticut constitution"); *State* v. *Marsala*, 216 Conn. 150, 165–72, 160, 579 A.2d 58 (1990) (rejecting "good faith" exception to exclusionary rule adopted in *United States* v. *Leon*, 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 [1984], as matter of state constitutional law under article first, § 7, and noting that "[w]e have

---

[7] "It is well established that federal constitutional and statutory law establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection for such rights." (Internal quotation marks omitted.) *State* v. *Geisler*, 222 Conn. 672, 684, 610 A.2d 1225 (1992). Indeed, Justice Brennan of the United States Supreme Court put it quite well when he wrote: "[S]tate courts cannot rest when they have afforded their citizens the full protections of the federal Constitution. State constitutions, too, are a font of individual liberties, their protections often extending beyond those required by the Supreme Court's interpretation of federal law. The legal revolution which has brought federal law to the fore must not be allowed to inhibit the independent protective force of state law—for without it, the full realization of our liberties cannot be guaranteed." W. Brennan, "State Constitutions and the Protection of Individual Rights," 90 Harv. L. Rev. 489, 491 (1977).

. . . determined in some instances that the protections afforded to the citizens of this state by our own constitution go beyond those provided by the federal constitution"); *State* v. *Geisler,* 222 Conn. 672, 690, 610 A.2d 1225 (1992) (refusing to follow *New York* v. *Harris,* 495 U.S. 14, 110 S. Ct. 1640, 109 L. Ed. 2d 13 [1990], as matter of state constitutional law, by holding that "the *Harris* rationale falls short of the protection required under our state constitution . . . [and agreeing] . . . that the exclusionary rule under article first, § 7, requires that evidence derived from an unlawful warrantless entry into the home be excluded unless the taint of the illegal entry is attenuated by the passage of time or intervening circumstances"); *State* v. *Oquendo,* supra, 223 Conn. 652 (declining "to adopt the restricted definition of a seizure employed . . . in [*California* v. *Hodari D.,* 499 U.S. 621, 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991)] and adher[ing] to our precedents in determining what constitutes a seizure under [article first, §§ 7 and 9, of] the state constitution"); *State* v. *Miller,* 227 Conn. 363, 377, 630 A.2d 1315 (1993) (refusing to adopt *Chambers* v. *Maroney,* 399 U.S. 42, 51–52, 90 S. Ct. 1975, 26 L. Ed. 2d 419 [1970], as matter of state constitutional law, by holding that warrantless noninventory search of automobile impounded by police is violation of article first, § 7); *State* v. *Joyce,* 229 Conn. 10, 15, 639 A.2d 1007 (1994) (holding that warrantless chemical analysis of defendant's clothing while in custodial possession of police was violation of article first, § 7, and, thereby, not reaching same claim under fourth amendment).

Indeed, within the last ten years, this court, although in dicta, indicated that a *Terry* search should not be extended to the automobile, thereby implicitly rejecting *Long* under our state constitution. The majority in *Dukes* stated the following: "We point out here that the officer's ability to search the vehicle is not to be justified as any continuation of his authority to conduct a pat-

down search specifically for weapons in order to protect himself, but is justified on the ground that the escalation of the defendant's involvement had . . . risen from that of a mere traffic violation to probable guilt of a 'crime' as our statutes define that term.[8] Despite the fact that one does not enjoy the same expectation of privacy as to the interior of his motor vehicle as one does in the interior of one's home, nevertheless, '[t]he word "automobile" is not a talisman in whose presence the Fourth Amendment fades away and disappears.' *Coolidge* v. *New Hampshire*, 403 U.S. 443, 461, 91 S. Ct. 2022, 29 L. Ed. 2d 564, reh. denied, 404 U.S. 874, 92 S. Ct. 26, 30 L. Ed. 2d 120 (1971). The same applies to an 'automobile' under article first, § 7, of the constitution of Connecticut. The exception to the warrant requirement in an automobile search demands that the searching officer have probable cause to believe that the vehicle contains contraband. *Carroll* v. *United States*, 267 U.S. 132, 153–54, 45 S. Ct. 280, 69 L. Ed. 543 (1925); *State* v. *Badgett*, [200 Conn. 412, 429, 512 A.2d 160, cert. denied, 479 U.S. 940, 107 S. Ct. 473, 93 L. Ed. 2d 373 (1986)]. So does article first, § 7, of our constitution." *State* v. *Dukes*, supra, 209 Conn. 126.[9]

The *Terry* search of an automobile significantly undermines our state constitutional jurisprudence with

[8] In *Dukes*, after the defendant's vehicle was legally stopped for speeding, the police officer learned that the defendant's operator's license had been suspended in both New York and Connecticut. *State* v. *Dukes*, supra, 209 Conn. 124. The court stated that "[d]riving under suspension is not a routine traffic violation, [and] it provides not only for a fine but also a term of imprisonment; it is thus a 'crime' that may be sanctioned by both a fine and imprisonment." Id., 125.

[9] This is underscored by the concurring justices in *Dukes*, Justices Shea and Covello, who took issue with the court's dicta and stated: "The search of the defendant's automobile was also permissible, whether or not there was probable cause to believe that it contained contraband, as the majority assumes, because it was made while the defendant remained at the scene under circumstances where it was reasonable for the arresting officer to remove a suspected threat to his own safety." *State* v. *Dukes*, supra, 209 Conn. 133.

respect to searches made of an automobile. We have heretofore held that a warrantless search of an automobile requires probable cause—that is, a determination "based on objective facts that could have justified the issuance of a warrant by a neutral magistrate at the time the search was made." *State* v. *Badgett*, supra, 200 Conn. 429. Notwithstanding that we allow a warrantless examination of an impounded automobile for police inventory purposes, we recently have held that a warrant is required for the search of an automobile in the custody of the police because the underlying reasons for allowing the search without a warrant do not pertain to vehicles already in police custody. *State* v. *Miller*, supra, 227 Conn. 383–84. Our preference for a warrant was demonstrated in *Miller*, even in light of the dissent in that case pointing out that the police could simply inventory the vehicle without probable cause and that contraband found pursuant to the custodial inventory would be admissible. Id., 388–89. Finally, as I previously pointed out, we decided this issue in *Dukes*, albeit by way of dicta.

Furthermore, the sociological considerations that we must take into account when construing our state constitution; *State* v. *Geisler*, supra, 222 Conn. 686; which I point out in part IV of this dissent, lead me to the conclusion that under our state constitution we should reject a *Terry*-type search of an automobile under *Long*.

My conclusion is further supported by the New York Court of Appeals decision in *People* v. *Torres*, 74 N.Y.2d 224, 543 N.E.2d 61, 544 N.Y.S.2d 796 (1989), and by the criticisms of *Long* as discussed by Professor Wayne LaFave in his widely recognized treatise on search and seizure law.

In *Torres*, the police received an anonymous tip that an individual wanted on homicide charges could be found at a certain location. Id., 226. The defendant, who

fit the anonymous telephone caller's description, was observed by two police detectives leaving the location with a shoulder bag and entering an automobile. Id. The detectives approached the car with their guns drawn, ordered the occupants to exit the vehicle, and then frisked the two occupants. Id. While the defendant was still being frisked, one of the detectives reached into the vehicle to retrieve the shoulder bag that the defendant had been carrying and had left in the front seat. Id. The detective first felt the exterior of the bag and then proceeded to unzip the bag, whereupon he discovered a handgun and ammunition. Id.

In *Torres*, the court preliminarily stated: "[T]he actions of the detectives [are] justified only if the expansive view of the *Terry* . . . 'stop and frisk' procedure that was adopted in [*Long*] is determined to be consistent with the privacy rights guaranteed by our State Constitution . . . . In concluding that it is not, we note that . . . this court has demonstrated its willingness to adopt more protective standards under the State Constitution when doing so best promotes predictability and precision in judicial review of search and seizure cases and the protection of the individual rights of our citizens." (Citations omitted; internal quotation marks omitted.) Id., 227–28.

Specifically, the court in *Torres* held that "[a] police officer's entry into a citizen's automobile and his inspection of personal effects located within are significant encroachments upon that citizen's privacy interests . . . . [S]uch intrusions must be both justified in their inception and reasonably related in scope and intensity to the circumstances which rendered their initiation permissible . . . . In this instance . . . the suspects had already been removed from the car, a permissible intrusion if there was a reasonable suspicion of criminality in light of the need to protect the detectives' safety . . . . Further, the suspects had been patted

down without incident. At that point, there was nothing to prevent these two armed detectives from questioning the two suspects with complete safety to themselves, since the suspects had been isolated from the interior of the car, where the . . . bag that supposedly contained the gun was located. Any residual fear that the detectives might have had about the suspects' ability to break away and retrieve the bag could have been eliminated by taking the far less intrusive step of asking the suspects to move away from the vicinity of the car . . . . Finally, it is unrealistic to assume, as the [United States] Supreme Court did in *Michigan* v. *Long,* supra, [463 U.S. 1051–52], that having been stopped and questioned without incident, a suspect who is about to be released and permitted to proceed on his way would, upon reentry into his vehicle, reach for a concealed weapon and threaten the departing police officer's safety. Certainly, such a far-fetched scenario is an insufficient basis upon which to predicate the substantial intrusion that occurred here . . . ." (Citations omitted.) *People* v. *Torres,* supra, 74 N.Y.2d 229–31.

Indeed, Professor LaFave, in his treatise on search and seizure law, has criticized *Long* by stating that "[t]he Court unfortunately took a most expansive view of what constitutes danger in the context of a *Terry* stop of a person in an automobile. As a result, *Long* can easily be read by lower courts so inclined as conferring on police the power to make extensive vehicle searches without probable cause incident to virtually any lawful stopping of a vehicle. It is thus quite fair to say, as the dissenters [in *Long*] warn, that 'the implications of the Court's decision are frightening.' "[10] 4 W.

---

[10] Professor LaFave continued with his criticisms of *Long* as follows: "Unquestionably the most perverse aspect of *Long* is the Court's assertion that because a *Terry* investigation 'at close range' requires the officer to make a 'quick decision as to how to protect himself and others from possible danger,' there is no requirement whatsoever 'that officers adopt alternative means to ensure their safety in order to avoid intrusion involved in a *Terry* encounter.' In other words, if an officer could avoid any risk of the suspect getting at any possible weapon in the car by having him exit and move away

LaFave, Search and Seizure (3d Ed. 1996) § 9.5 (e), p. 289.

Finally, I agree with the dissenters in *Long*, Justices Brennan and Marshall, when they stated the following:

from the vehicle . . . he may ignore that alternative and thereby create a continuing danger that justifies a search inside the automobile which is likely to uncover evidence of any criminal conduct for which the officer lacks probable cause to search. No authority is cited to support this bootstrapping principle because there is none. Indeed, *Terry* and its progeny point in the opposite direction. In *Terry*, the Court stressed that a search for weapons must 'be strictly circumscribed by the exigencies' and 'limited to that which is necessary,' which is hardly consistent with this new notion that the police are free to fashion their own exigencies and necessities. . . . Because [ordering any lawfully stopped driver out of his or her vehicle will reduce the likelihood that an officer will be the victim of an assault] . . . it is particularly unfortunate that the Court in *Long* permitted (indeed, encouraged) officers to forego that alternative and similar protective measures in order to broaden their authority to make searches without probable cause. Had the court in *Long* instead indicated that alternative protective measures should be utilized whenever feasible, the decision would have permitted protective searches of vehicles in a relatively small (and tolerable) number of cases." 4 W. LaFave, Search and Seizure (3d Ed. 1996) § 9.5 (e), pp. 289–90.

Professor LaFave also stated that "[t]o justify a protective search, *Terry* instructs, there must be a reasonable belief that the suspect is 'armed and *presently* dangerous.' Except perhaps in extraordinary circumstances, no such belief will exist as to post-detention access, for it is most unlikely that a suspect would want to attack the officer who had just told him he was free to go. In *Long*, for example, it seems fanciful that if the police had concluded [the driver] was not intoxicated and had permitted him to go his way, perhaps after issuing a ticket for speeding, there was any appreciable risk that [the driver] would then have returned to his car, obtained a weapon, and tried to attack the officers before they left the scene.

"In support of its conclusion that the danger to officers in the context of vehicle stops is such as to justify the broad search power conferred, the Court in *Long* relied on an empirical study of police shootings also cited by the Court in the past. But a closer examination of that study reveals that it does not give credence to the *Long* analysis. The study reports that of police officers shot in connection with vehicle stops, about half were shot by persons seated in or concealed in a car, about a third by persons standing outside the car talking to the police, and the rest by persons then exiting the car or fleeing the scene. Quite clearly, a power to search the car is neither adequate nor necessary to protect the police in any of those situations. No mention is made in the study of any instance in which a person outside the car returned to the vehicle and then shot the officer, and thus it is quite understandable why the author [of the study] does not propose that police be allowed to search cars, but rather that they maintain better 'vehicle

"Plainly, the Court is simply continuing the process of distorting *Terry* beyond recognition and forcing it into service as an unlikely weapon against the Fourth Amendment's fundamental requirement that searches and seizures be based on probable cause." *Michigan* v. *Long,* supra, 463 U.S. 1054. In answering the sole justification for the *Terry* search, these dissenting justices in *Long* put the search of the automobile in its proper perspective. "Today's decision disregards the Court's warning in [*Almeida-Sanchez* v. *United States,* 413 U.S. 266, 273, 93 S. Ct. 2535, 37 L. Ed. 2d 596 (1973)]: 'The needs of law enforcement stand in constant tension with the Constitution's protections of the individual against certain exercises of official power. It is precisely the predictability of these pressures that counsels a resolute loyalty to constitutional safeguards.' . . . Of course, police should not be exposed to unnecessary danger in the performance of their duties. But a search of a car and the containers within it based on nothing more than reasonable suspicion, even under the circumstances present here, cannot be sustained without doing violence to the requirements of the Fourth Amendment. There is no reason in this case why the officers could not have pursued less intrusive, but equally effective, means of insuring their safety. . . . The Court takes a long step today toward 'balancing' into oblivion the protections the Fourth Amendment affords." (Citations omitted.) *Michigan* v. *Long,* supra, 1064–65 (Brennan and Marshall, Js., dissenting).

I also conclude that the majority today gouges the heart out of the search and seizure provisions of our state constitution and goes a long way in dismantling what we heretofore thought was this state's protection of our right to privacy.

occupant control while issuing traffic tickets, interrogating, or [performing] other routine police business.' " (Emphasis in original.) Id., pp. 291–92.

III

Although for purposes of this dissent, I need not go further than the *Terry* search of the automobile under the state constitution, I feel compelled to do so under the federal constitution because of the outrageousness of the facts of this case. The majority either obfuscates or omits those facts. Simply put, the seizure of the defendant based upon a mere traffic violation, accomplished by approaching the defendant's vehicle with a drawn pistol directed at the defendant and his brother (the passenger), ordering the defendant to exit his vehicle and locking him in the rear seat of the police cruiser, and then, after a second police officer arrived at the scene, removing the defendant from the cruiser and frisking him, which revealed that the defendant had no weapons on his person and, finally, placing handcuffs on him and relocking him in the cruiser, constituted an impermissible intrusion on his constitutional right to be free from unreasonable searches and seizures under the fourth amendment to the United States constitution. All of the foregoing was done without either officer making any reasonable inquiries with respect to asking the defendant for a driver's license or vehicle registration, and without asking either the defendant or his passenger for identification, which information would have disclosed the fact that the passenger in the defendant's automobile, his brother, was a resident in the building of the parking lot where Ciesinski found the defendant's automobile. Under any standard, the actions on the part of the police officers cannot pass constitutional muster.

"The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular

circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate? . . . Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction. . . . And simple good faith on the part of the arresting officer is not enough. . . . If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be secure in their persons, houses, papers, and effects, only in the discretion of the police." (Citations omitted; internal quotation marks omitted.) *Terry* v. *Ohio*, 392 U.S. 1, 21–22, 88 S. Ct. 1868, 20 L. Ed. 889 (1968).

Preliminary to my analysis, I think it is important to establish first the nature of the search and seizure in this case. I must confess, I am not quite certain from reading the majority opinion whether the court relies on a *Terry* search, a search incident to an arrest, or a new breed of search and seizure—that is, a search incident to an arrest that the police officers never intended to make because the defendant's conduct was, for all intents and purposes, a traffic violation that required a summons. The majority reviews this case within the context that there was "statutory authority to arrest" and on that basis stated that "we consider whether Ciesinski acted reasonably in detaining the defendant." It seems to me that the majority travels down a dangerous path: it is either a search incident to a lawful arrest—which it simply is not in this case—or it must be justified under *Terry*.

Although I have serious reservations with respect to whether Ciesinski complied with *Terry* from the very

beginning of his encounter with the defendant,[11] I will assume that his actions in ordering the defendant out of the car at gunpoint, locking him in the police vehicle, and conducting the *Terry* search of the defendant's person after the second police officer arrived all passed constitutional muster. This is quite an assumption.[12] Nevertheless, it certainly was not a justifiable seizure of him when the officers placed handcuffs on the defendant and returned him to the rear of the locked cruiser the second time—all in light of the admission by Ciesinski that at the time this occurred, his ultimate intention was to issue the defendant a traffic summons. The majority justifies these invasions into the privacy of the defendant, as well as his illegal restraint, on the ground that they were required for the police officers' safety. Under any circumstances, these degrading activities were nothing less than highly intrusive and constituted an illegal restraint on his person.

Although "[t]he scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case"; *Florida* v. *Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983); there is nothing in the record in this case that would justify this second seizure of the defendant. See *Terry* v. *Ohio*, supra, 392 U.S. 17–18 ("a search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope"); see also *United States* v. *Place*, 462 U.S. 696, 706, 709, 103 S. Ct. 2637, 77 L. Ed. 2d 110 (1983) (concluding that principles of *Terry* and its progeny would permit officer to seize

---

[11] See part I of this dissent with respect to Ciesinski's incident report.

[12] It is clear that this court must make a de novo determination of whether there was sufficient reasonable suspicion that the defendant was engaged in criminal activity and this determination must be made on a particularized and objective basis. See *Ornelas* v. *United States*, 563 U.S. 963, 1008, 116 S. Ct. 1657, 134 L. Ed. 2d 911 (1996) (holding that "as a general matter determinations of reasonable suspicion . . . should be reviewed de novo on appeal").

luggage from person in order to investigate circumstances that aroused suspicion, "provided that the investigative detention is properly limited in scope" and also indicating that "the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion"). "To discourage unreasonable searches and seizures, the evidence obtained as a direct result of that illegal search or seizure, as well as the 'fruits,' or evidence derived therefrom, are excluded from evidence, unless the connection between the 'fruits' and the illegal search has been sufficiently attenuated to be purged of its primary taint. *Segura* v. *United States*, 468 U.S. 796, 804–805, 104 S. Ct. 3380, 82 L. Ed. 2d 599 (1984)." *State* v. *Geisler*, supra, 222 Conn. 682. Accordingly, the gun found in this case must be suppressed because of the intolerable intensity and scope of the seizure of the defendant.

Notwithstanding the illegal seizure of the defendant the second time, the *Terry* search of the vehicle, under the facts of this case, cannot pass federal constitutional muster. In this case, there were two police officers at the scene and no weapons were found on either the defendant or his brother. Nothing caused the police officers' concerns for safety to escalate, and the officers clearly had secured the situation and could have questioned the defendant and his brother away from the automobile. There was no reasonable basis for the police officers to conclude that they could possibly be threatened if they merely issued a traffic summons and went on with their business. The multilayered seizure of the defendant and his brother, and the subsequent search of the defendant's automobile, went well beyond being reasonably related in scope and intensity to the circumstances and clearly infringed on the defendant's constitutional rights.

Indeed, in *Terry*, the court carefully stated that "[w]e merely hold today that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and *makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety*, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." (Emphasis added.) *Terry* v. *Ohio*, supra, 392 U.S. 30. The officers in the present case failed to make *any* inquiries, even when nothing occurred to cause their concerns for safety to escalate.

Because I am also of the opinion that the police in this case stepped well over the bounds of permissible police activity under the fourth amendment, I would suppress the evidence found in this case. *Wong Sun* v. *United States*, 371 U.S. 471, 484–88, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963); *State* v. *Greenfield*, 228 Conn. 62, 67, 634 A.2d 879 (1993). There is no claim in this case that the illegal police activity has "become so attenuated as to dissipate the taint of the primary illegality." *State* v. *Ostroski*, 201 Conn. 534, 546, 518 A.2d 915 (1986).

IV

The act of a *Terry* search and seizure of the defendant cannot be taken lightly—it is an invasion of privacy that interferes with a human being's dignity. Speaking of the search itself, the United States Supreme Court recognized that "it is simply fantastic to urge that such a procedure performed in public by a policeman while the citizen stands helpless, perhaps facing a wall with

his hands raised, is a 'petty indignity.' It is a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly." *Terry* v. *Ohio*, supra, 392 U.S. 16–17. "Even a limited search of the outer clothing for weapons constitutes a severe, though brief, intrusion upon cherished personal security, and it must surely be an annoying, frightening, and perhaps humiliating experience." Id., 24–25. Likewise, in the present case, under the guise of a *Terry* investigation, the manner of the prolonged seizure of the defendant was an invasion of his privacy and dignity without any compelling justification.

The court's decision today leaves the door wide open for the invasion of the privacy of a person by allowing police officers expansive rights to seize and search individuals and their vehicles for the most insignificant motor vehicle violation. It should not surprise anyone that the subjects of these searches will not be the affluent who live in towns such as Greenwich, but, rather, the poor who are compelled to live in the ghettos of Hartford, New Haven and Bridgeport. No president of a "Fortune 500" company, having been stopped by a police officer for a traffic violation, would ever be ordered out of his automobile by the officer at gunpoint, locked in a police cruiser, and when a second officer arrives, taken out of the cruiser and subjected to a *Terry* search of his person and, finally, handcuffed and placed back into the locked vehicle while his automobile is searched.

It is this court's responsibility to review independently the actions of police officers in order to determine whether there has been a violation of a person's constitutional rights.[13] In doing so, we establish stan-

---

[13] See footnote 12.

dards for future police conduct in order to protect the constitutional rights of all our citizens—the poor as well as the affluent. Unfortunately, the standards for police conduct that this court establishes today for a *Terry* search and seizure will come down most severely and inhumanely on those who can least protect themselves.[14]

Justice Jackson put the fourth amendment in sharp focus when he wrote: "[Fourth Amendment rights] are not mere second-class rights but belong in the catalog of indispensable freedoms. Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government. And one need only briefly to have dwelt and worked among a people possessed of many admirable qualities but deprived of these rights to know that the human personality deteriorates and dignity and self-reliance disappear where homes, persons and possessions are subject at any hour to unheralded search and seizure by the police." *Brinegar* v. *United States*, 338 U.S. 160, 180–81, 69 S. Ct. 1302, 93 L. Ed. 1879 (1949) (Jackson, J., dissenting). The arbitrariness today is focused on the poor which undermines a respect for the law.

I dissent.

---

[14] For every one of the outrageous invasions of privacy and egregious illegal seizures of a person, such as in this case, there are obviously countless other such incidents of which we are unaware because there was no "fruit" of the search or seizure. For these innocent persons who are subject to such indignities, life is comparable to living in a police state.