[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION RE: MOTIONS TO SUPPRESS
Introduction
The defendant, Ronald F. Strano, has been charged with fifteen armed robberies and one attempted armed robbery. He has moved to suppress all seized property as well as any admissions and/or confessions that he may have made, claiming that they were obtained as a result of his illegal stop and a subsequent illegal search. Testimony and argument were heard on these motions on August 23, 24, 27, 2001; September 6, 7, 13, 14 and 17, 2001. The court heard testimony from Lieutenant Michael Greenier, Detective Robert O'Gara, Sergeant John Collins, Officer Richard Haynes, Sergeant David Orozco, Detective Don Skewes, and Detective Steven Chipman of the Vernon police department as well as Lieutenant Joseph Morrissey of the Manchester police department and Clyde Gill, parts manager of Clyde Chevrolet-Buick. Strano also presented the testimony of Michael Udvardy, a private investigator. Briefs were filed by the State and Strano on January 4, 2002.
Findings of Facts
From the evidence presented the court finds the following facts. On January 8, 2001, a robbery was reported at Smoker's Discount World located at 435 Main Street in Manchester. The robber was described by the victims as a lone white male wearing a gray ski mask who displayed a small dark hand gun and demanded money from the clerk. The clerk gave the robber about $130. The robber then bound both clerks with duct tape.
On January 24, 2001, a robbery occurred at Pete's Package Store on CT Page 5710 Windsorville Road in Vernon. The robber was described as a lone middle-aged white male wearing a gray ski mask with one opening for the eyes. He had a small hand gun and ordered the clerk to hand over money. He shoved a customer to the floor and fled on foot. The robber was described as five feet six to five feet eight inches tall. He stole approximately $60.
On January 27, 2001, a robbery occurred at the Comfort Inn on the Hartford Turnpike (Route 30) in Vernon. The robber was described as a male wearing a gray jacket and a ski mask with a single opening for the eyes. He produced a small black revolver and ordered the clerk to the floor. The robber was described as five feet five inches tall. He stole $386.
On January 30, 2001, a robbery occurred at the DB Mart at 352 Hartford Turnpike (Route 30) in Vernon. The robber was described as a white male five feet eight inches tall with brown eyes wearing a dark colored jacket and a dark blue or gray ski mask with a single eye opening. He displayed a small black revolver. The car he was driving was described as a white two door newer model Toyota with darkly tinted windows. He stole $60.
On February 1, 2001, a robbery occurred at the Courtyard by Marriott on Slater Street in Manchester. The robber was described by the victim as a lone white male between five feet six and five feet eight inches tall with light colored eyes, wearing a ski type mask, armed with a small dark hand gun. The robber stole $275.
On February 3, 2001, a robbery occurred at the Holiday Inn Express on Kelly Road in Vernon. The robber was described as a white male with a small black pistol wearing a greenish gray ski mask with one eye opening and a grayjacket. The robber was described as between five feet six and five feet eight inches tall. The robber ordered the clerk to the floor. The robber stole $400.
On February 7, 2001, a robbery occurred at Discount Cigarette on the Hartford Turnpike (Route 30) in Vernon. The robber was described as approximately thirty-five years old and about five feet six inches tall with blue eyes. He was wearing a brownish jacket and a light colored ski mask that was not pulled over his face. He displayed a small black revolver and ordered the clerk to the floor. The car he was driving was described as a newer looking light blue station wagon. About $450 was stolen. Utilizing computer software and information supplied by the victim, Detective O'Gara developed a composite drawing of the suspect to which the victim concurred.
On February 9, 2001, a robbery occurred at the Connecticut Motor Lodge CT Page 5711 at 400 Tolland Turnpike in Manchester. A vehicle pulled up directly in front of the office of the motel. A lone white male, five feet six inches tall, exited the car, entered the office and confronted the clerk. He was armed with a small, black gun which looked like a revolver. He demanded money from the clerk, received it, and ordered her to the floor. He was wearing a ski type mask and winter type clothing. He left in a small, dull gray colored vehicle after having stolen $560.
On February 17, 2001, a robbery occurred at the Howard Johnson's Hotel in Vernon. The robber was described as driving a newer model dark green colored car. He was described as a white male, five feet eight inches tall with dirty blond hair and blue eyes. He was wearing a gray cloth jacket, gray ski mask with a single eye opening and thick black gloves with gray suede grips. He displayed a small black revolver which he pointed at the clerk's head. Approximately $1,800 was stolen. In cooperation with the victim, Detective Skewes did a composite drawing of the robbery suspect. The victim had seen the suspect drive in without a mask on.
On February 24, 2001, there was an attempted robbery at the Dunkin Donuts on Talcottyille Road (Route 83) in Vernon. The robber was described as a lone white male five feet six inches tall, wearing a light faded green ski mask with one eye hole and a beige jacket. He displayed a small dark colored revolver and ordered the clerk to the register but he refused and called 911. The suspect then fled northbound on Route 83, in an older white Ford LTD or Galaxy, away from the closest entrance to Interstate 84 which was only a short distance away.
On February 25, 2001, there was a robbery at the Getty Gas Station at 176 Tolland Turnpike in Manchester. The robber was described as a lone white male who drove up to the station. He confronted the clerk and displayed a small antique hand gun. He was wearing a ski type mask and gloves and had green eyes. He stole $1,700 and fled in a four door white, late 1980s to early 1990s, Chevy.
On March 7, 2001, a robbery occurred at the DB Mart on Route 83 in Vernon. The robber was described as a white male between five feet five inches and five feet eight inches tall wearing a light colored ski mask with a single eye opening and a light colored sweater with a light colored jacket. He displayed a small black hand gun. The witness thought the robber may have been Hispanic although his skin was white. He drove a small white vehicle with no license plate on the back and headed north on Route 83. The robber stole $380.
On March 10, 2001, the Howard Johnson's Hotel in Vernon was robbed, again. The robber was identified by the victim, who was the same in both CT Page 5712 robberies, as the same person who robbed the Hotel on February 17. He was wearing a dark colored ski mask with a single eye opening and a grayish jacket and black and gray colored gloves. He displayed a small black revolver. He left in a small light colored car with no rear license plate. He stole $276.
On March 13, 2001, the Cape Cod Crafters store on Hale Road in Manchester was robbed. The victim described a car pulling up in front of the store and a white male with a tan ski-type mask coming in and confronting the clerk and demanding money. The man's eyebrows were light colored and he was described as short. He left in a newer vehicle which was described as white with red trim after stealing $275.
On March 18, 2001, a robbery occurred at Hudlow's Exxon on the Tolland Turnpike in Manchester. A white two door older car with a red interior parked directly in the front of the front doors and a white male with a green colored mask and gloves with the fingertips cut off entered the store and confronted the clerk displaying a short black hand gun. The robber was described as five feet three inches tall. A surveillance video captured the robber pulling up in his car to the store and entering the store.
On March 20, 2001, at approximately 10:00 p.m., a robbery occurred at the Seven-Eleven Store at the intersection of Route 30 and Vernon Avenue in Vernon, only a half mile from the Vernon Police Station. The robber was described as a white male about five feet five inches tall, wearing a gray ski mask with a single eye hole and a light grayjacket. He was carrying a small black hand gun. He drove a white four door older model vehicle. A video surveillance camera captured a view of the robber, as described by the victim, and of the car used by the robber. The video also shows that the robber is about five feet six inches tall based on the height indicator marks on the door of the store. The robber stole $200. Based on the physical characteristics and the nature of the robbery, the police believed that this robbery was carried out by the same person as the previous robberies in Manchester and Vernon.
From the pictures of the car taken from the surveillance tape at the Seven-Eleven, the police were able to determine, after consulting with the parts manager of a local Chevy/Buick dealer in the morning of March 21, 2001, that the car involved was a 1988, 1989 or 1990 white Buick Regal. This identification was made based on the car's distinctive front grill and lights, as well as the type of ornament on the hood.
The police departments from the adjoining towns of Vernon and Manchester worked together to solve these crimes. They formed an opinion that the robberies were being performed by one individual based on the CT Page 5713 clothing (winter jacket and ski mask with single eye hole), physical description of the robber (white male of short stature), the way the crime was committed (robber wore a mask, entered and exited quickly, and acted calmly and efficiently, armed with a gun), the description of the weapon (small dark hand gun), types of businesses targeted (those which would have cash), and the vehicle used (described as white in one-half of the robberies). In fact, the Howard Johnson's Hotel had been robbed twice by the same person. The locations of the robberies also aroused the police's suspicion that the robber resided in the area because the robberies were occurring in a defined area and, despite intensive police surveillance, the robber was able to elude police. This indicated to the police that he was familiar with the area and had a safe haven or home in the area of the robberies. They had placed surveillance on likely escape routes, such as Interstate 84, and were unsuccessful. In fact, in two instances, the robber was seen leaving the scene in the direction away from the quickest access to the highway. No similar robberies were occurring in other areas and the number of robberies was unusual for the area. The police also believed that the robber was not a kid and had a past criminal record because he was efficient, each robbery was done in a short period of time, and there was a recklessness about the manner of the robberies. Also, first time offenders do not usually start out committing armed robberies. They also suspected that he was a drug addict based on the amount of money stolen and the frequency of the crimes. The police also believed the robber may have had a police scanner since shortly after a surveillance was called off at the Holiday Inn Express the hotel was robbed.
In the afternoon of March 21, 2001, the Manchester police obtained a printout from the Department of Motor Vehicles of every 1988, 1989, and 1990 two-door Buick Regal registered in the last five years. The police then reviewed the list for those registered owners who resided in Manchester, Vernon and South Windsor because these towns bordered the area where the robberies had occurred. The list was disseminated to the South Windsor and Vernon police.
The Manchester police reviewed each of the vehicles in Manchester against the information they had regarding the owner's physical description and criminal history, and also checked the actual car, if it could be located, to determine if the owner matched the description of the robber or the car matched the vehicle used in the robberies. The Vernon police did a similar review. of the thirteen owners on the list from Motor Vehicles in Vernon and South Windsor, only Strano, who appeared on the list as owning a 1989 white two-door Buick Regal, had a criminal record. He had a criminal record of convictions for robbery and weapons. Strano was also identified as a suspect because he was five feet six inches tall with blue eyes and he presently was living in Vernon but CT Page 5714 had previous addresses in Manchester. His wife and children presently resided in Manchester. Those addresses were also close to the cites of a number of robberies. Strano's present address of 26 Allen Drive in Vernon was only a short distance from the DB Mart which was robbed on March 7, 2001. Lieutenant Morrissey of the Manchester police department tried to locate Strano's vehicle but was unable to do so. The plan was to set up a surveillance of Strano's car on March 22, 2001. The police believed that, based on the frequency of the robberies and the amounts stolen, that another robbery would likely occur that day.
On March 22, 2001, at approximately 1:00 p.m., Officer Haynes of the Vernon police department was patrolling Route 83 for signs of the suspect's vehicle and any robberies. Haynes was aware that the suspect's vehicle was a white 1988, 1989 or 1990 Buick-Regal with a red interior and that the suspect lived on Allen Drive. He was also expecting that another robbery would likely occur soon. While driving south on Route 83, he spotted a white Buick Regal without a front license plate driving north. Haynes turned his vehicle around and headed north but lost sight of the Buick. He then spotted the vehicle at Thornton's gas station. The vehicle was parked up against the building. Haynes thought it odd the way the car was parked since it was not at a gas pump and it was blocking part of a parking space at a location where the station clerk could not see it.[1] Haynes pulled in to check the license plate of the vehicle and thought he might be interrupting a robbery since the car appeared unoccupied. As Haynes proceeded past the vehicle a white male sat up, after leaning over into the passenger or back seat. Haynes believed that the occupant had seen him as he went by. Haynes ran the license plate and found that the car was registered to Strano of Allen Drive and that it should have had both a front and rear license plate. Since the vehicle matched the description of that of the robbery suspect and it had been parked strangely at Thornton's, and Haynes thought he had interrupted a robbery, he wanted to stop the car. While running the motor vehicle check he radioed Detective Skewes of the Vernon police department and advised him that the Strano car had been parked suspiciously at Thornton's and he wanted to stop the car and Skewes said "fine." Since Skewes and the other detectives investigating the robberies were concerned that the robber may have had a police scanner, and therefore the driver might know the police were following him, and the fact that he might have a gun, Skewes, after consulting with Lieutenant Greenier, told Haynes to stop the car. Haynes followed the car and stopped it on Allen Drive, a few yards from Strano's house. Haynes called in the stop to the Department and exited his cruiser. As he did so he noticed the operator moving around in the vehicle and he appeared to be reaching down and Haynes suspected that he was either reaching for or hiding a gun. Haynes went to the left side of the car and asked Strano for his license and registration, which he already had out. Haynes then went back to his cruiser to wait for CT Page 5715 backup. Haynes got out the composite of the robbery suspect he had in the cruiser. Haynes noticed that the interior of Strano's car was red and that Strano looked like the composite drawing. He also noticed an uncanny resemblance between the picture on Strano's license and the composite. Nothing dispelled his suspicion that he was the suspect. Then fellow police officers Hammick, Orozco, Chipman, Skewes and Greenier all arrived on the scene. All the police cars were parked in a vertical row directly behind Strano's car. Skewes and Greenier also noticed that the composite matched the picture of Strano on his license. In addition, Greenier noticed that the license plate on the rear of the car was dirty but the screws had no rust which indicated that the plate could have been removed. The car also had a red interior and a red stripe on each side. With Skewes and Haynes on the driver side and Orozco on the passenger side the officers approached the vehicle. Neither Haynes nor Skewes had their weapons drawn. Orozco had his weapon out in a low ready position. When Skewes approached the vehicle he saw a two-toned glove like that used in the Howard Johnson's robbery on the passenger seat and two jackets, similar to those described in the robberies, on the back seat. Skewes also believed that the car matched the car from the Seven-Eleven video. It was becoming clear to him that Strano was the robber and he became concerned that there was a gun in the car. The driver appeared nervous and a little panicky. Skewes asked him if he had any weapons or drugs and Strano made a quick movement or lunged with both hands towards the glove box without replying to the question. Skewes told Strano not to reach for the box and that they were going to search his vehicle. At that point Haynes drew his weapon and Orozco opened the passenger side door since he thought Strano was reaching for a weapon and with the door closed he could not see below the door line. Skewes asked Strano to step out of the vehicle. He was then taken out of the car to get him away from the car in case a weapon was inside. Strano was then patted down by Sergeant Orozco for weapons in order to insure the safety of the police officers on the scene. No weapons were found on his person.
After conferring with Lieutenant Greenier, Skewes decided to do a protective sweep of the passenger compartment of the car for weapons. Skewes asked Strano for consent to search his vehicle but he refused. Skewes then did a "pat down" of the vehicle, he looked anywhere a weapon could be hidden yet reached. He looked under the driver's seat and then started to move the heavier of the two jackets when he felt a heavy object in the pocket of the jacket which felt like a gun. He looked in the pocket and saw a blue bag which he took out, and, when he opened it, found a ski mask with one eye hole in it which matched the description of the ski mask used in some of the robberies. Surgical gloves were also found in the bag and a small black revolver fell out of the bag. Skewes yelled "gun" in a matter of seconds after he got to the car. He then stopped the pat down of the car. Strano was immediately handcuffed and CT Page 5716 placed under arrest.
Discussion
Strano claims that "[t]he physical evidence and statements, admissions and/or confessions sought to be introduced in this case against [him] were obtained as a result of an illegal motor vehicle stop of Mr. Strano, a seizure of his person, and a subsequent illegal search of his vehicle." Memorandum of Law in Support of Defendant's Motion to Suppress, p. 8. Strano claims that he was subject to a de facto arrest without a warrant and without probable cause and that he was then subjected to an illegal search of his vehicle. Thus all such evidence should be suppressed pursuant to the doctrine of the "fruit of the poisonous tree."
The Stop
There appears to be no dispute that Strano was seized when he was stopped. The police admitted that he was not free to leave. A seizure occurs within the meaning of the state constitution when, considering all the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave. State v. Oquendo, 223 Conn. 635,653, 613 A.2d 1300 (1992). Strano recognizes that there are exceptions to the requirements that police have a warrant before engaging in a search and seizure. The Fourth Amendment of the United States constitution guarantees against unreasonable searches and seizures, and is applicable to the states pursuant to the Fourteenth Amendment. This guarantee is implicated when a person is detained against his will whether it is an arrest or an investigatory stop. State v. Watson, 165 Conn. 577, 584,345 A.2d 532 (1973). Whenever a police officer stops a person and restrains his ability to depart, he has "seized" that person. Terry v.Ohio, 392 U.S. 1, 16 (1968). The constitution forbids only unreasonable searches and seizures. State v. Mitchell, 204 Conn. 187, 195, 527 A.2d 1168
(1987). "[C]ertain seizures are justifiable under the Fourth Amendment even in the absence of probable cause if there is articulable suspicion that a person has committed or is about to commit a crime. Florida v.Rover, 460 U.S. 491, 498, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)] (plurality opinion) (emphasis added). United States v. Hensley,469 U.S. 221, 227, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985)." (Internal quotation marks omitted.) State v. Edwards, 214 Conn. 57, 71, 570 A.2d 193
(1990). This recognized exception is what is known as a "Terry stop." InTerry v. Ohio, 392 U.S. 1, 2 (1968), the Supreme Court recognized that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." The standards articulated by the Court in Terry govern the legality of CT Page 5717 investigatory detentions under our state constitution as well. State v.Oquendo, supra, 223 Conn. 654.
In State v. Watson, supra, 165 Conn. 584-85 the Court stated: "Furthermore, in Adams v. Williams, 407 U.S. 143, 146, 92 S.Ct. 1921,32 L.Ed.2d 612, the court held that "[a] brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.' Effective crime prevention and detection underlie the recognition that a police officer may, in appropriate circumstances and in an appropriate manner, approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest. "[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.' Terry v. Ohio, supra, 21. An officer must act on more than a mere hunch. These facts upon which the stop is predicated and the suspicion which they arouse, in addition to forming the basis for a lawful stop, limit the scope of the officer's initial actions following the stop. Carpenter v. Sigler, 419 F.2d 169,171 (8th Cir.); see Terry v. Ohio, supra, 29. The results of the initial stop may arouse further suspicion or may dispel the questions in the officer's mind. If the latter is the case, the stop may go no further and the detained individual must be free to go. If, on the contrary, the officer's suspicions are confirmed or are further aroused, the stop may be prolonged and the scope enlarged as required by the circumstances." See also State v. Acklin, 171 Conn. 105, 110-11, 368 A.2d 212 (1976).
"The test enunciated by the United States Supreme Court of whether an investigative stop passes constitutional muster balances the nature of the intrusion upon personal security against the importance of the governmental interest inducing the intrusion. See United States v.Hensley, supra, 228. A strong law enforcement interest has been particularly recognized in the context of felonies or violent crimes, because "it is in the public interest that the crime be solved and the suspect detained as promptly as possible.' Id., 229. Furthermore, when the situation in which a suspect has been detained [during a motor vehicle stop on a public street there is] . . . a lesser expectation of privacy; see, e.g., Rakas v. Illinois, 439 U.S. 128, 99 S.Ct. 421,58 L.Ed.2d 387 (1978); South Dakota v. Opperman, 428 U.S. 364,96 S.Ct. 3092,49 L.Ed.2d 1000 (1976); fourth amendment protections have been deemed to be correspondingly less stringent. Winston v. Lee, 470 U.S. 753,767, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985)." State v. Mitchell,204 Conn. 187, 196, 527 A.2d 1168 (1987).
The police do not need probable cause to believe that a crime has been CT Page 5718 committed to make a lawful stop of a motor vehicle, they need only have "a reasonable and articulable suspicion that a person has committed or is about to commit a crime." State v. Coardes, 51 Conn. App. 112, 115,720 A.2d 1121 (1998), cert. denied, 247 Conn. 957, 723 A.2d 814 (1999), cert. denied, 526 U.S. 1094, 1195 S.Ct. 1511, 143 L.Ed.2d 663 (1999). Strano claims that the police did not have a reasonable and articulable suspicion to initiate a Terry stop of him. "Whether a reasonable and articulable suspicion exist depends on the totality of the circumstances." (Citations omitted.) Id., 116. "Reasonable suspicion is a less demanding standard than probable cause." (Internal quotation mark omitted.) State v. Groomes, 232 Conn. 455, 468, 656 A.2d 646 (1995). "`Reasonable and articulable suspicion is an objective standard that focuses not on the actual state of mind of the police officer, but on whether a reasonable person, having the information available to and known by the police, would have had that level of suspicion.' State v.Torres, 230 Conn. 372, 379, 645 A.2d 529 (1994), citing State v.Januszewski, 182 Conn. 142, 148-49, 438 A.2d 679 (1980), cert. denied,453 U.S. 922, 101 S.Ct. 3159, 69 L.Ed.2d 1005 (1981). "The police officer's . . . must be based on more than a hunch or speculation.' Statev. Cofield, supra, 220 Conn. 45. "In justifying the particular intrusion "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry v. Ohio, supra, [392 U.S.] 21.'State v. Januszewski, supra, 148-49." State v. Gant, 231 Conn. 43, 65,646 A.2d 835 (1994). "Once a reasonable and articulable suspicion exists, [the police] may conduct an investigative `stop' of the suspect to confirm or dispel [their] suspicions. . . ." (Internal quotation marks omitted.) State v. DaEria, 51 Conn. App. 149, 155, 721 A.2d 539 (1998).
In reviewing the legality of the stop, the court must "examine the specific information available to the police officer at the time of theinitial intrusion and any rational inferences derived therefrom." (Internal quotation mark omitted.) State v. DaEria, 51 Conn. App. 155-56, quoting State v. Oquendo, supra, 223 Conn. 654. The collective knowledge of an entire police force may be imputed to an individual officer when he is requested to stop and search a vehicle. State v. Hoffler, 174 Conn. 452,459, 389 A.2d 1257 (1978); see also State v. Schoenbneelt, 171 Conn. 119,124, 368 A.2d 117 (1976); State v. Acklin, supra, 171 Conn. 111; Statev. Watson, supra, 165 Conn. 586.
Here, the police had information that fourteen armed robberies and one attempted armed robbery had been committed by the person they believed committed the robbery on March 20, 2001, at the Seven-Eleven. From the evidence gathered at that robbery, it was determined that the perpetrator drove a 1988, 1989 or 1990 white Buick Regal. Because of the centralized locations of the robberies and the police's inability to capture the CT Page 5719 robber despite repeated surveillance, the police reasonably believed that the robber lived locally. The motor vehicle records revealed only a small number of persons who lived in Vernon owning a car like that of the perpetrator and Strano was among them. He was also identified as a suspect because he had lived in both Manchester and Vernon where the robberies occurred. From the description of the robber, not only from the previous robberies, but also clearly from the video of the Seven-Eleven robbery, the robber was a lone white male approximately five feet six inches tall. Strano's physical description also matched that of the robber in that he was five feet six inches tall. Lastly, Strano had a criminal record for robbery and weapons and was the only owner of the type of car driven by the perpetrator with such a record living in Vernon.
While patrolling the area for signs of any of the vehicles similar to those of the suspect as well as signs of any robberies, Officer Haynes spotted a car resembling that used in the Seven-Eleven robbery parked oddly at Thornton's, a convenience store like those which had been the target of previous robberies. When the officer drove by the car he first thought the car was unoccupied until he saw a male occupant sit up from having been bending over. Haynes did not stop and question Strano then but ran his license plate and called the detectives investigating the robberies. Officer Haynes confirmed that the vehicle was registered to Strano, who had been identified as a suspect through the motor vehicle records regarding the car used in the Seven-Eleven robbery only two days before. The investigating detectives also confirmed that Officer Haynes should stop Strano based on the results of their investigation of the robberies which also led them to believe that another robbery would occur that day.
Based on these facts, it is clear that Officer Haynes and the other members of the Vernon police department had a reasonable and articulable suspicion that Strano was the perpetrator of the robbery at the Seven-Eleven as well as the other robberies and that he was about to commit another robbery at Thornton's until he saw Officer Haynes. Therefore the police were justified in conducting an investigatory stop of Strano. The fact that the police may have had suspicions as to others as well does not detract from the reasonableness of their suspicions as to Strano. Nor does the possibility that any of the facts on which the police's suspicions were based standing alone might not have supported a reasonable suspicion, negate the propriety of the stop, since it is the totality of the circumstances which must be examined. Based on the totality of the circumstances, the suspicions of the police were reasonable and Strano's stop was proper. "The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape.' Adams v. Williams, 407 U.S. 143, CT Page 5720 145, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)." State v. Holloman,20 Conn. App. 521, 525, 568 A.2d 1052, cert. denied, 214 Conn. 805,573 A.2d 317 (1990).[2]
The Stop as an Arrest
Once Strano was stopped the police were required to use the least intrusive means necessary to dispel or verify their suspicions. InFlorida v. Rover, 460 U.S. 491, 500 (1983), the Court reiterated that: "This much, however, is clear: an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. See, e.g., United Statesv. Brignoni-Ponce, supra, at 881-882; Adams v. Williams, supra, 146. It is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure."
"The limits of an investigative stop to investigate past criminal conduct cannot be precisely defined. "The proper way to identify the limits is to apply the same test already used to identify the proper bounds of intrusions that further investigations of imminent or ongoing crimes. That test, which is grounded in the standard of reasonableness embodied in the Fourth Amendment, balances the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion.' United States v. Hensley,469 U.S. 221, 228, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985); State v.Mitchell, 7 Conn. App. 46, 60, 507 A.2d 1017 (1986), aff'd in part and rev'd in part on other grounds, 204 Conn. 187, 527 A.2d 1168, cert. denied, ___ U.S. ___, 108 S.Ct. 293, 98 L.Ed.2d 252 (1987). Determination of the means and duration that are reasonably necessary for an investigative stop depends on a fact-bound examination of the particular circumstances. See State v. Braxton, 196 Conn. 685, 689, 495 A.2d 273
(1985). The principal factor in this determination is whether the police acted diligently under the circumstances to dispel or confirm their suspicions. United States v. Sharpe, supra, 686-87." State v. Foster,13 Conn. App. 214, 217, 535 A.2d 393 (1988).
Here, the police compared Strano's likeness not only as presented in person but also as pictured on his license with the composites previously prepared using information from the victims of the robberies and found them to match. The police also observed that his car's coloring matched that described by the victims. There was also evidence that the rear license plate of the car may have been recently removed. In addition, a glove and jackets similar to those described as being worn in the CT Page 5721 robberies were seen in his car. Nothing the police observed dispelled their suspicions that Strano was the robber.
Strano claims that since the officers never asked him any questions to which he could have responded to confirm or dispel the officer's suspicions, that it is clear that the officers were really only interested in arresting him and searching his car without the necessity of obtaining the proper warrants. In recognition of a person's right to personal security, the police are required to use the least intrusive means necessary to either confirm or dispel their suspicions after a stop. Here the police did just that, they used their own observations of Strano, his car, and its clearly visible contents while seeking to confirm or dispel their suspicions. These means were clearly not intrusive upon him beyond that allowed by a Terry stop. The fact that the police did not intrude further, by questioning Strano, does not establish that the means used by the police to confirm or dispel their suspicions were improper.
Strano also claims that even if his stop was legitimate under Terry,
the police's actions went beyond that necessary for a Terry stop in that they used force and authoritative conduct beyond that required for such a stop. Therefore, Strano claims that his stop escalated into an arrest, and, since the police admit that they lacked probable cause for his arrest when he was stopped, the search of his car and subsequent arrest were illegal. "A Terry stop that is justified at its inception can become constitutionally infirm if it lasts longer or becomes more intrusive than necessary to complete the investigation for which that stop was made. SeeUnited States v. Sharpe, 470 U.S. 675, 684, 105 S.Ct. 1568,84 L.Ed.2d 605 (1985); Florida v. Royer, 460 U.S. 491, 500, 103 S.Ct. 1319,75 L.Ed.2d 229 (1983). "Like the determination of initial justification, this inquiry is fact-bound.' State v. Aillon, supra, 401; see also P. Bator J. Vorenberg, "Arrest, Detention, Interrogation and the Right to Counsel: Basic Problems and Possible Legislative Solutions,' 66 Colum. L. Rev. 62, 63 (1966). `The results of the initial stop may arouse further suspicion or may dispel the questions in the officer's mind. If the latter is the case, the stop may go no further and the detained individual must be free to go. If, on the contrary, the officer's suspicions are confirmed or are further aroused, the stop may be prolonged and the scope enlarged as required by the circumstances.' Statev. Watson, 165 Conn. 577, 585, 345 A.2d 532 (1973); see also State v.Aillon, supra; State v. Carter, supra, 618." State v. Mitchell, supra,204 Conn. 197.
In State v. Braxton, 196 Conn. 685, 495 A.2d 273 (1985) the defendant conceded that his stop was permissible under Terry but argued that his detention was unreasonably intrusive and therefore unconstitutional when CT Page 5722 the police officer placed him in his police car. The court found such detention constitutionally permissible noting that: "One function of a constitutionally permissible Terry stop is to maintain the status quo for a brief period of time to enable the police to investigate a suspected crime. A police officer who has proper grounds for stopping a suspect has constitutional permission to immobilize the suspect briefly in order to check a description or an identification, so long as his conduct is strictly tied to and justified by the circumstances which rendered its initiation permissible. Terry v. Ohio, supra, 19; see Model Code of Pre-Arraignment Procedure (Proposed Official Draft 1975) § 110.2 (3), and pp. 284-85. Determination of the means that are reasonably necessary to maintain the status quo necessarily depends upon a fact-bound examination of the particular circumstances of the particular governmental intrusion on the personal security of a suspect." (Internal quotation marks omitted; footnote omitted.) State v. Braxton, supra,196 Conn. 689. This line is crossed, however, when the police forcibly remove a suspect from a place and transport him to a police station where he is detained for investigatory purposes. Such detentions are sufficiently like arrests to require probable cause. State v. Edwards,
supra, 214 Conn. 72-73. Here, although Strano was not free to leave, he was not forcibly restrained or removed from the site. He admits that his detention was for not more than twenty minutes before his arrest. Memorandum of Law in Support of Defendant's Motion to Suppress, p. 40. His detention was permissible within the limits of Terry.
In State v. Holloman, 20 Conn. App. 521, 526, 568 A.2d 1052, cert. denied, 214 Conn. 805, 573 A.2d 317 (1990), the defendant claimed "that he was arrested when the police stopped the Blazer because the officers had their revolvers drawn when they ordered the occupants out of the car." The court held that "[t]he officers, however, were aware that an armed robbery in which a handgun was stolen had recently occurred in the neighborhood. "A police officer `need not defer . . . protective measures to the point of peril.'" State v. Escobales, 16 Conn. App. 272, 275,547 A.2d 553, cert. denied, 209 Conn. 827, 552 A.2d 434 (1988), cert. denied, 490 U.S. 1023, 109 S.Ct. 1753, 104 L.Ed.2d 189 (1989), citingUnited States v. Coates, 495 F.2d 160, 165 (D.C. Cir. 1974). Furthermore, the mere fact that the stopping officers had their guns drawn did not automatically convert the Terry stop into an arrest. UnitedStates v. Nargi, 732 F.2d 1102, 1106 (2d Cir. 1984); State v. Wylie,10 Conn. App. 683, 687-88, 525 A.2d 528, cert. denied, 204 Conn. 807,528 A.2d 1154 (1987)." There is no hard and fast rule concerning the display of weapons in investigative stops, it depends on the crime under suspicion and the degree of suspicion as well as other factors. UnitedStates v. Nargi, 732 F.2d 1102, 1106 (2d Cir. 1984). Here the police believed that they may be dealing with the perpetrator of a series of armed robberies who could be armed and pose a threat to their safety. It CT Page 5723 was clearly appropriate that they take action to insure their safety, including the drawing of their weapons during the stop. Such action by the police did not convert the stop into an arrest.
Lastly, the number of officers who responded to the scene of the stop was not unreasonable. The police were dealing with what they believed to be a potentially dangerous situation and the presence of six officers cannot be said to have turned the stop into an arrest especially where there was no evidence that Strano was physically restrained or treated harshly or that the officers took any other action beyond what was needed to ensure the safety of all involved.
The Search
In Terry, the Supreme Court also held that not only is a investigatory seizure appropriate under certain circumstances but that a subsequent search for weapons is also permissible under the constitution "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him. Such a search is a reasonable search under the Fourth Amendment, and any weapons seized may properly be introduced in evidence against the person from whom they were taken." Terry v. Ohio, supra, 392 U.S. 30.
"During a Terry detention, the police may conduct a pat-down search to locate weapons if they reasonably believe that the suspect may be armed and dangerous. See id., 24. According to Terry v. Ohio, supra, 20-27, where a reasonably prudent officer is warranted in the circumstances of a given case in believing that his safety or that of others is endangered, he may make a reasonable search for weapons of the person believed by him to be armed and dangerous regardless of whether he has probable cause to arrest that individual for a crime or the absolute certainty that the individual is armed. Once a reasonable and articulable suspicion exists, an officer may detain a suspect to conduct an investigative stop to confirm or dispel such suspicions (. . . .) Our courts apply a test that weighs the totality of the circumstances. See id., 21-22. An officer may conduct a pat-down frisk for weapons if the officer possesses a reasonable suspicion that the person possesses a weapon. See Ybarra v.illinois, 444 U.S. 85, 93, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979). To CT Page 5724 determine whether an investigatory detention and pat-down are permissible a two part inquiry is utilized: (1) was the officer justified in initially detaining the individual based on specific and articulable facts, and (2) did specific and articulable facts exist that suggested that the individual presented a harm to the officers or others so as to justify the pat-down. See State v. Wilkins, supra, 240 Conn. 489; see also United States v. Holzman, 871 F.2d 1496 (9th Cir. 1989)." State v.Gregory, 56 Conn. App. 47, 52-53 (1999), 741 A.2d 986, cert. denied,252 Conn. 929, 746 A.2d 790 (2000).
"Once a reasonable and articulable suspicion exists, the detaining officer may conduct an investigative `stop' of the suspect to confirm or dispel his suspicions and may "frisk' the suspect to determine if the person is carrying a weapon. Terry v. Ohio, supra; State v. Federici,179 Conn. 46, 51, 425 A.2d 916 (1979); State v. Acklin, 171 Conn. 105,112-13, 368 A.2d 212 (1976)." State v. Kyles, 221 Conn. 643, 660,607 A.2d 355 (1992).
Even where the initial pat down of the suspect reveals nothing, consistent with the protections provided by our state constitution, the police may still search the passenger compartment of the suspect's car to dispel their concerns of a safety threat if the suspect is not placed under arrest and is allowed to reenter the vehicle. State v. Wilkins,240 Conn. 489, 502, 692 A.2d 1233 (1997). "In Michigan v. Long, supra, 1049, the United States Supreme Court held that an officer conducting aTerry stop of an automobile may search the passenger compartment of the automobile for weapons, limited to areas where the weapon might be hidden, if the officer reasonably believes the suspect is potentially dangerous. During the course of such a search, the officer may legitimately uncover incriminatory evidence that establishes probable cause to arrest the suspect. State v. Acklin, supra, 113." State v.Kyles, supra, 221 Conn. 660, see also State v. Wilkins, supra,240 Conn. 496. In Kyles, the court held that the police were not required to secure further information beyond that which formed the basis for the stop before they conducted a protective search of the defendant and the passenger compartment of his car for weapons. There, a robbery had been committed and a description of the perpetrator was broadcast to the police in the field. It advised that the perpetrator was a black male, about five feet nine inches tall, with a brown leather jacket and that he used a handgun and had gotten into a yellow Cadillac with something in the passenger window and with three other people. An officer subsequently observed a yellow Cadillac with four occupants with a sun screen in the passenger side window. The officer pulled the vehicle over. The court rejected the defendant's argument that once his vehicle had been stopped the police should have investigated further to determine whether the physical features of the occupants matched the description of the CT Page 5725 perpetrators before conducting any search.
Since the officers' stop of Strano was proper, and nothing the officers observed after the stop dispelled their suspicions, and in light of the fact that he was a suspect in a series of armed robberies, the subsequent search of his vehicle for weapons was also constitutionally permissible. Therefore the items recovered from the search as well as Strano's subsequent confession after his arrest should not be suppressed.
Conclusion
The motions to suppress are denied.
Scholl, J.